WILLIAM E. MITCHELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85612.    Promulgated August 15, 1939.

*W. A. Sutherland, Esq., Edward R. Kane, Esq.,* and *Elbert P. Tuttle, Esq.,* for the petitioner.

*Jonas M. Smith, Esq.,* for the respondent.

434

438

OPINION.

BLACK: The first issue in this proceeding is whether petitioner's income tax returns for the years in question were false or fraudulent with intent to evade tax. The deficiencies determined by the respondent and the 50 percent additions thereto which were added under the provisions of section 275 (b) of the Revenue Acts of 1924 and 1926 and section 293 (b) of the Revenue Act of 1928 are barred by section 277 of the Revenue Acts of 1924 and 1926 and section 275 of the Revenue Act of 1928, respectively, unless under section 278 (a) of the 1924 and 1926 Acts and section 276 (a) of the 1928 Act the returns filed by petitioner were, respectively, false or fraudulent with intent to evade tax. "Fraud is a fact to be proven by clear and convincing evidence." *Charles E. Mitchell*, 32 B. T. A. 1093, 1128. Congress in section 601 of the Revenue Act of 1928 has placed the burden of proof in respect of this issue upon the respondent.

The respondent in support of his contention that he has met the burden relies primarily upon the alleged establishment of three fraudulent acts, namely, (1) the omission from income in 1925 of a profit of $14,075.50 from two sales of 300 shares of Southeastern utility stock, and the omission from income in 1926 of a profit of $1,702.50 from the sale of Southeastern option warrants, (2) the erroneous deduction taken by petitioner in his 1929 return of a loss of $69,120 from the sale of 2,000 shares of Atlantic stock, and (3) the overstatement by petitioner in his returns of the cost of Southeastern and Commonwealth utility stocks in the amounts of $72,-018.53 for 1926, $42,214.38 for 1928, $57,894.66 for 1929, and $209,-039.84 for 1930. Petitioner admits that the above errors were made, but denies that they were knowingly made or were made with any

intention of evading tax. We shall consider the three alleged acts of fraud in the order given.

(1) Regarding the first act, the respondent argues that petitioner's failure to report the items of $14,075.50 for 1925 and $1,702.50 for 1926 when he had all the information available in his personal files, with no explanation as to how the amounts were omitted, is prima facie evidence of fraud. The facts with reference to the preparation of petitioner's 1925 and 1926 returns have been fully stated in our findings of fact and will not be repeated in any great detail here.

A summary of petitioner's testimony relative to the $14,075.50 item is that he could not now explain why this item was omitted from his 1925 return; that certain statements relative to the item were received by petitioner from Steiner, Rouse & Strock (stock brokers); that these statements were available when his return for 1925 was made up; that he did not personally make up the return; that "we honestly intended to report everything and to make honest returns"; and that if the return had not been honest, he would not have signed it.

The only evidence offered by the respondent as to the $1,702.50 item was a supplemental protest sworn to by petitioner and filed with the respondent in 1935, in which petitioner says that the amount "was inadvertently omitted by Taxpayer's attorneys in computing the tax for the year 1926 as shown in Taxpayer's original protest dated September 9, 1935."

During the years 1925 through 1930 petitioner, in addition to the three above sales, made 87 sales of 38,450 shares of Southeastern and Commonwealth utility stocks at a total correct selling price of $723,389. On these sales petitioner reported the selling price or amount received as $732,455.49, or $9,066.49 in excess of the correct amount. The fact that these 87 sales were included in petitioner's returns is persuasive evidence that petitioner was not intentionally omitting any sales from his returns. The profit from the three sales that were omitted in 1925 and 1926 amounted to approximately 2.48 percent of the total profit as determined by the respondent and agreed to by petitioner on the 90 sales that were made during the years now before us.

The respondent determined the profit on the two sales of 300 shares of Southeastern utility stock omitted from the 1925 return as follows:

| Date of sale | Number of shares | Selling price | Cost basis | Net profit | How basis determined |
|---|---|---|---|---|---|
| 7/13/25 | 100 | $11,471 | $400.00 | $11,071.00 | First in, first out. |
| 7/28/25 | 200 | 31,342 | 28,337.50 | 3,004.50 | Identified. |
|  | 300 | 42,813 | 28,737.50 | 14,075.50 |  |

The sale of the 200 shares on July 28, 1925, was identified with lots Nos. 19 and 21, which were purchased on July 13 and July 28, 1925, respectively. The sale of the 100 shares on July 13, 1925, could not be identified and as to those shares the respondent applied the first in, first out rule and arrived at the cost of $400 for lot No. 2, which was purchased in the year 1922. Counsel for petitioner points out in his brief that on July 13, 1925, petitioner purchased 100 shares of Southeastern utility stock (lot No. 18) for $10,575, and on the same day sold 100 shares for $11,471, so that from a realistic standpoint he made only $896 on that day from dealings in this stock, whereas, under the respondent's application of the first in, first out rule, since the shares sold were not identified with any particular lot, his profit on these shares has been determined to be $11,071. Petitioner never heard of the first in, first out rule until about 1933 or 1934, and he kept no regular set of books.

We think the circumstances described above make it reasonable to believe that petitioner was telling the truth when he said he honestly intended to report everything in these two returns for 1925 and 1926. We think the Commissioner has not established that the two omissions in question were fraudulently made with intent to evade tax.

(2) The second alleged act of fraud is the erroneous deduction of $69,120 taken by petitioner in his 1929 return upon the sale of the 2,000 shares of Atlantic Ice & Coal Co. stock. The respondent contends, very much as he did in *Charles Weyl et al., Executors*, 38 B. T. A. 850, that there was no bona fide sale to Courts & Co. and that therefore in claiming a loss petitioner was committing fraud on the Government. We think the evidence establishes that there was a bona fide sale of the stock on November 25, 1929. The reason why the loss claimed is not deductible is on account of the agreement to repurchase on January 3, 1930, entered into between petitioner and Courts & Co. on December 12, 1929, or 17 days after the sale. Section 118 of the Revenue Act of 1928 [1] provides that if anyone "has entered into a contract * * * to acquire substantially identical property" no deduction for the loss shall be allowed. Petitioner's explana-

---

[1] SEC. 118. LOSS ON SALE OF STOCK OR SECURITIES.

In the case of any loss claimed to have been sustained in any sale or other disposition of shares of stock or securities where it appears that within thirty days before or after the date of such sale or other disposition the taxpayer has acquired (otherwise than by bequest or inheritance) or has entered into a contract or option to acquire substantially identical property and the property so acquired is held by the taxpayer for any period after such sale or other disposition, no deduction for the loss shall be allowed under section 23 (e) (2) of this title; nor shall such deduction be allowed under section 23 (f) unless the claim is made by a corporation, a dealer in stocks or securities, and with respect to a transaction made in the ordinary course of its business. If such acquisition or the contract or option to acquire is to the extent of part only of substantially identical property, then only a proportionate part of the loss shall be disallowed.

tion is that he did not know of this provision of the law and that he thought that if he sold the stock and waited more than 30 days to repurchase it, he would be entitled to the deduction.

S. H. Rogers was the revenue agent who on March 31, 1931, made the first examination of petitioner's return for 1929. Rogers was an experienced revenue agent, having been in the service since about the year 1921. He testified that his was a very brief examination; that he talked with petitioner; that he did not remember having talked with him about the Atlantic stock loss, except to explain to him that he was entitled to a greater loss than he had taken; that he remembered having seen the invoice slip showing the sale of the Atlantic stock to Courts & Co., that he did not see the repurchase agreement or the invoice slip showing the repurchase or either of the letters under date of November 25, 1929, and January 3, 1930, set out in our findings; that he was the agent who had recommended the refund of $47.92; and that he was given everything that he had asked to see while there.

Petitioner testified that he went to Courts & Co. and probably told them that he wanted to sell the stock for a tax loss; that he would want to reestablish his position in it by rebuying into the company; that he had completely forgotten about the repurchase agreement until the matter was brought up by his attorney, who found it in his files; that he thought he had consummated a regular sale of stock; that he thought the transaction he had entered into gave him a legal right to take a tax loss; and that he would not have taken it if he had not thought so. Regarding Revenue Agent Rogers' visit, petitioner's testimony is in part as follows:

A. I remember he came in and questioned about the sale, yes.

Q. Did you tell him you had repurchased that stock?

A. I can't say whether I did today; if he had asked me that question, I would have told him, and if he did ask me, I did tell him.

Q. Did you tell him you had entered into an agreement * * * to repurchase the stock * * *?

A. I don't presume I did because it would have no effect on my mind at that time, it would have no bearing on the question he was asking me about. I didn't know at that time what I know today since this matter has been brought up; the signing of the agreement does not [sic] prevent me from using it for a loss, and it didn't enter in my mind at that time that it was not a proper deductible item, nor had I the slightest idea that I had not a perfect right to buy the stock back, whether it was that or other stock, and the fact, if I may say—

Q. Go ahead.

A. I had thought everything was lawful, and if the Agent had any thought of it at the time, if he had thought there was anything wrong, he had the liberty to ask because I made it a practice that whenever they came in, and I think you will find they will say that my files and whatever I had were perfectly available to them; in fact, I frequently called Mr. Nabors, and I said, "If there is anything you don't understand, or any facts or figures that you need,

Mr. Nabors is available and everything I have got is at your disposal," I had only a desire to be sure I had my affairs in order.

* * * * * * *

A. I certainly thought it was proper and, therefore, I never did any more about it; there was certainly no effort at concealment.

We think this feature of the case narrows down to whether petitioner at the time he filed his 1929 return was aware of that provision of section 118 of the Revenue Act of 1928 denying a stock loss to one who within thirty days of the sale "has entered into a contract or option to acquire substantially identical property." If petitioner knew of this provision at the time he filed his return, we think he would be guilty of filing a false or fraudulent return with intent to evade tax, for certainly at that time (March 15, 1930) he was well aware of the agreement to repurchase. There is no evidence to show that petitioner knew of this particular provision of the law. Therefore, his claiming the deduction appears to have been due to a mistake of law, with no apparent intent to evade tax. Under such circumstances fraud can not be found. On this issue the Commissioner has not sustained his burden of proof.

(3) The third alleged act of fraud is the one which caused the largest understatement of income. Petitioner's erroneous determination, through his agents Maguire and Nabors, of his cost basis of the utility stocks caused petitioner's income for the taxable years involved in this proceeding to be understated in the total amount of $381,167.41. This was a very serious and substantial understatement of income and merits the closest scrutiny.

We have in our findings of fact set out in considerable detail the exact manner in which Maguire for 1926 and Nabors for 1928, 1929, and 1930, acting for petitioner, arrived at the cost basis of the stock sold in those years. Briefly, Maguire attempted to identify each of the 25 sales in 1926 with certain purchases previously made. In the final determination by the Commissioner only 2 sales could be identified and it was necessary to apply the first in, first out rule to 23 sales. Maguire testified at the hearing as a witness for the respondent and the substance of his testimony was that at the time he prepared the schedule for petitioner's income tax return for 1926, showing the 25 sales of stock in question, he had never heard of the first in, first out rule, that he did his best to prepare the schedule correctly, and that he thought he had done so when he turned it over to Nabors to be used in the preparation of petitioner's income tax return for the year 1926.

We have no reason to doubt the truth of Maguire's testimony. The testimony shows that both Nabors and petitioner relied upon the schedule which had been prepared by Maguire and believed that it was correct.

Respondent's allegation that petitioner's income tax return for 1926 was false and fraudulent with intent to evade tax is therefore not sustained. We make the same holding as to petitioner's income tax returns for the years 1928 and 1929. However, the facts as to these two latter years are not the same as for 1926. Maguire had nothing to do with the preparation of the 1928 and 1929 returns. These returns were prepared by Nabors and signed and sworn to by petitioner. In their preparation Nabors took as the basis of cost of most of the utility stock sold in these years the highest cost utility stock owned by petitioner. It was represented by a 5,000-share block of Southeastern voting trust certificates then up as collateral security with the Southeastern Securities Co. of New York City to secure the payment of two notes which petitioner owed the Securities Co. Nabors made no attempt to fix the cost basis of shares sold by the identification of the particular certificates sold or by the application of the first in, first out rule. He testified that he never heard of the first in, first out rule until long after the returns in question were filed and that at the time he filed the 1928 and 1929 returns he thought petitioner had the right to deduct from the selling price of the stock sold the highest cost of an equivalent number of shares then owned by petitioner. To the same effect is the testimony of petitioner. It is plain that he and Nabors talked over this question of the cost basis to be used and came to the conclusion that petitioner had the right to use his highest cost stock. In 1928 the cost of 1,400 of these 5,000 shares was used in determining the gain on the sale of 1,400 shares of Southeastern stock. In 1929, 1,500 more of the shares were thus used. Then came on June 10, 1929, the reorganization when shares of Southeastern were exchanged for shares of Commonwealth on the basis of 4½ shares of Commonwealth and certain option warrants for 1 share of Southeastern.

At the time the reorganization came in 1929, according to the method which was being used by Nabors and concurred in by petitioner, the cost basis of 2,900 shares of the 5,000 share block had been used up, leaving 2,100 shares. These 2,100 shares converted into Commonwealth shares represented 9,450 shares of the latter. Of these 9,450 Commonwealth shares Nabors used up 5,500 in 1929 in figuring petitioner's cost basis of Commonwealth stock sold after the reorganization. Of course, it can be readily seen that this method of using as a basis of cost of petitioner's stock sold in 1928 and 1929 the highest cost stock owned by petitioner without reference to the identification of any particular certificates of shares sold was an erroneous method of figuring cost and resulted in large understatements of income.

We are not convinced, however, by the evidence that either Nabors or petitioner had any intention to deceive by the use of this method

in the years 1928 and 1929. We therefore hold that the Commissioner's determination of fraud for 1928 and 1929 is not sustained.

The year 1930, we think, is different and a different result must be reached for that year. Although petitioner had used up most of the cost basis of the 5,000-share block of Southeastern stock, including the shares of Commonwealth into which the remainder had been converted, in figuring his gains on sales of stock in 1928 and 1929, he set about in 1930 to use up this same cost basis of this block of stock, now converted into Commonwealth, all over again. Our findings of fact show in full detail how this was done. Both petitioner and Nabors, who prepared the 1930 return for petitioner, admitted in their testimony at the hearing that they knew they had no right to use the cost basis of the same block of stock twice; they admitted that by the use of any reasonable degree of diligence they could have ascertained that most of the cost basis of the 5,000-share block had been used up in 1928 and 1929. They gave no reasonable explanation as to why they used the cost basis of the same 5,000-share block of stock twice. Nabors testified that he was unable to tell why or how he could have become so confused as to use the basis of this 5,000-share lot the second time. He testified: "I, of course, knew that stock could only be sold once and yet even now, after three years or more that this investigation has been under way, I am unable to explain how I made that sort of a mistake." He also testified: "I can offer no explanation except that it was an error, unintentional, of course, not deliberately made." The substance of petitioner's explanation is that he relied upon the correctness of the computations made by Nabors and that it did not occur to him to question their accuracy. In the light of all the facts in the record, we find ourselves unable to accept this explanation.

By the end of the year 1930 petitioner had deducted $524,588.40 as cost of utility stock sold from 1925 through 1930. The entire amount of utility stock—Alabama, Southeastern, and Commonwealth—which petitioner had purchased from 1920 through 1930 had cost him only $493,289.74. Of this stock at the end of the year 1930 he still had on hand 81,257.5 shares of Commonwealth stock and 53,536.5 option warrants with a total cost basis of $302,831.25, figured on the basis of the first in, first out rule and by identification of shares wherever that is possible. Yet notwithstanding that petitioner had already deducted in prior years and the year 1930 the entire cost basis of all his stock, he went right on using as his cost basis the cost of the 5,000-share block. This was largely responsible for an understatement of his income for the year 1930 of $209,040.34. Furthermore, this very pronounced overstatement of costs went right on through 1931. While 1931 is not before us for redetermination of the

deficiency, the evidence as to that year is a part of the record of the instant case. A summary of the cost of the utility stocks and option warrants deducted by petitioner on his returns for the years 1925 through 1931 shows that he deducted a total cost of $938,965.15. The total cost which should have been deducted as now agreed upon by the parties is $392,368.56.

We do not think petitioner can be guilty of such careless indifference to the basis of cost of shares of stock which he was selling and to a correct return and the oath to which he subscribed and now expect to be be absolved from the consequences of his acts. It does not tax our credulity to believe that in the years 1928 and 1929 petitioner knew nothing about the first in, first out rule and believed that he had the right to use, as the cost basis of the stock which he sold, the cost basis of an equivalent number of the highest cost shares which he owned, but certainly petitioner knew that he could not use the same block of stock twice in figuring his cost basis of stock sold. This he has done, and he gives no satisfactory explanation as to why he did it.

The Commissioner does not have to establish his determination of fraud "beyond a reasonable doubt." All that he is required to do is to make proof of his fraud charges by a preponderance of the evidence which is clear and convincing. *In re Locust Building Co.*, 299 Fed. 756. In the instant case he has proved *clearly* that in filing his income tax return for 1930 petitioner used in large part all over again as his basis of cost for Commonwealth shares sold in that year the cost basis of shares which had been largely used up in the prior years of 1928 and 1929, he has proved that petitioner knew that he had no right to do this, and that the use of such unauthorized basis of cost was largely responsible for an understatement of income for 1930 of $209,040.34. This, in the absence of any satisfactory explanation by petitioner, is convincing proof to us that petitioner's income tax return for 1930 was false and fraudulent with intent to evade tax. Cf. *White* v. *United States*, 20 Fed. Supp. 623; *M. Rea Gano*, 19 B. T. A. 518; *Frank A. Weinstein*, 33 B. T. A. 105; *Charles E. Mitchell, supra*.

Petitioner strongly relies upon the finding in his favor upon the issue of fraud for the taxable year 1931 by the District Court of the United States for the Middle District of Georgia in the case of *William E. Mitchell* v. *W. E. Page, Jr., et al.*, decided March 30, 1938. All of the evidence in that proceeding has been introduced by petitioner in this proceeding and we have carefully considered it.

It is sufficient to say that we regard the proof which respondent has submitted on the issue of fraud for the year 1930 as considerably stronger than that which he submitted before the court in the 1931

case. Particularly is this true of petitioner's use in 1930 for the second time in determining the basis of cost of certain shares of Commonwealth sold in that year of the 5,000-share block of stock which we have already mentioned. Respondent at the hearing in the instant case traced in great detail the use of this 5,000-share block of stock by petitioner in making his income tax returns for 1928, 1929, and 1930. This respondent did by offering in evidence the work sheets used by Nabors in making up petitioner's income tax returns for the years 1928, 1929, and 1930. No such evidence appears to have been before the court in the 1931 case. Petitioner does not contend that the decision of the United States District Court for the Middle District of Georgia in the 1931 case is *res judicata* on the fraud issue involved in this proceeding. He concedes that it is not.

For the reasons which we have stated above, we hold that petitioner's income tax return for 1930 was false and fraudulent with intent to evade tax, that the deficiency for that year is not barred by the statute of limitations, and that part of the deficiency is due to fraud with intent to evade tax and the 50 percent penalty added to the tax by the Commissioner is sustained.

The parties have stipulated that petitioner made 35 sales of Commonwealth stock in 1930, totaling in all 25,400 shares; that the correct amount realized from the sales of these shares was $296,925; that the correct cost was $11,740.97; and that the correct net gain was $285,188.03.

Ordinarily we would accept these figures as correct, without question, but there is in evidence petitioner's Exhibit No. 6, which is entitled "Complete Chronological Statement through 1930 of all transactions in stock of Alabama Traction Light and Power Company, Southeastern Power and Light Company, and Commonwealth and Southern Corporation."

The Commissioner determined the deficiencies for the years in question upon the basis of this chronological statement. The figures for 1930 and other years given in this chronological statement show that the Commissioner completely disregarded the rule of averaging costs which takes place when there is a statutory reorganization and shares in an old corporation are exchanged for shares in the new corporation. See *Christian W. Von Gunten*, 28 B. T. A. 702; affd., 76 Fed. (2d) 670; followed by the Board as recently as *Henry Hudson*, 39 B. T. A. 1075.

The facts show that on June 10, 1929, petitioner exchanged 23,794 shares of Southeastern stock which he owned for 107,073 shares of stock and 53,536.5 option warrants in Commonwealth in a statutory reorganization. Instead of allocating the entire cost basis of petitioner's shares in Southeastern between the common stock and op-

tion warrants which he received in Commonwealth and then averaging the cost basis of each share of Commonwealth in accordance with the rule laid down by the Board in the *Von Gunten* case, the Commissioner continued to use the first in, first out rule against the old shares owned in Southeastern. He appears to have used exactly the same method in computing petitioner's gain on the sales of Commonwealth in 1930 as he used in the *Von Gunten* case, which method we disapproved in that case. For example, as we figure it, the 23,794 shares in Southeastern which petitioner owned at the time of the reorganization on June 10, 1929, had a cost basis to him of ¡$291,-391.96. We are not making a finding of fact to this effect because this computation is made by us after giving effect to the other reorganization which took place in 1924, when shares in Alabama were exchanged for shares in Southeastern, and would, of course, be subject to mathematical error, but the figures are all in the record, from which a correct computation can be made. Whatever the correct figure is, it should be used in a recomputation under Rule 50. Assuming that our figures of $291,391.96 as the cost basis of the 23,794 shares of Southeastern stock are correct, then, when these were exchanged for 107,073 shares of Commonwealth stock and 53,536.5 option warrants, petitioner thereafter had a cost basis of $2.2964 per share for his Commonwealth stock after allocating a part of the $291,391.96 cost basis to the option warrants.

As already stated, the Commissioner in determining the deficiency for 1930 used the first in, first out rule, applying it to the old shares in Southeastern without using the averaging rule laid down in the *Von Gunten* case. This apparently, as applied to the year 1930, has resulted in a considerable overstatement of net income. It should be corrected in a recomputation under Rule 50.

Apparently similar errors were made for the other taxable years in question, which, however, did not result in nearly so pronounced an overstatement in net income. In fact petitioner's income for 1929 will be considerably more than the Commissioner has determined. In view of the fact, however, that we have held that the statute of limitations bars any deficiencies for these other years, their correction becomes unimportant.

As we view it, this failure of the Commissioner to apply the rule laid down by the Board in the *Von Gunten* case does not in the slightest degree affect the issue of fraud. Petitioner has not contended that he was endeavoring to apply the first in, first out rule or the rule of averaging prescribed by the *Von Gunten* case. What he did do was to use as a basis of cost his highest cost stock, whether those particular shares were sold or not, and in 1930 he used again a cost basis of shares already used up in prior years. The facts as to

this have already been fully discussed and will not be repeated, since they have nothing to do with the first in, first out rule or the rule of averaging in the *Von Gunten* case.

We direct the recomputation of the deficiency for 1930 to be made in accordance with the *Von Gunten* case, however, because we are convinced that it will result in a considerably lower tax and penalty for 1930 and petitioner should not be required to pay any greater tax and penalty for 1930 than he owes.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

———

TURNER, concurring: While I concur in the conclusion reached and the thoughts expressed in the majority opinion, the picture presented by the record in this case prompts me to express some additional views.

The petitioner is an engineer and since May 1927 has been vice president and general manager of the Georgia Power Co., with offices located in Atlanta, Georgia. He graduated in 1903 from the Massachusetts Institute of Technology, with a degree of Bachelor of Science in electrical engineering. After serving two years with the General Electric Co. in Schenectady, New York, he was employed for six years in Brazil, returning to the United States in 1911, at which time he procured a position as construction foreman with the General Electric Co. on the west coast. Early in 1912 he was employed by the Alabama Power Co. as electrical engineer in connection with the development of the first major hydroelectric project in that state. This project combined the development of navigation and water power. By 1919 or 1920 he had advanced to the position of vice president in charge of operations, which position was held by him, except for a brief interlude of a few months during which time he returned to Brazil, until he was appointed to his present position. By 1920 he was drawing a salary of approximately $18,000 a year and at or about that time he began the purchase of stock in the Alabama Traction Light & Power Co., which in turn held the stock of the Alabama Power Co. and a number of other subsidiaries. In or about 1924 the Alabama Traction Light & Power Co. became a subsidiary of the Southeastern Power & Light Co. and the petitioner continued the policy of making his principal investments in the stock of that company. He had in mind the building up of a substantial estate, principally for the purpose of providing adequate income for his wife and daughter in the event anything should happen to him. During the period from 1920 through 1931, and possibly some subse-

quent years, the petitioner carried out a program which included the purchase and sale of securities in substantial quantities. The bulk of these securities were the stock of public utilities, as previously indicated. Some of the shares sold were acquired not by purchase, but by way of stock dividends and split-ups. During the years 1925, 1926, 1928, 1929, and 1930 the petitioner made 89 different sales covering 38,750 shares of public utility stocks.

From his testimony, and to some extent the testimony of other witnesses, it would appear that the petitioner is the type of man who maintains and exercises meticulous regard for proper personal conduct in all of his activities, civic as well as business, and who has a high sense of responsibility to his family, to his community, and to his government. The distinct impression is made that he has consistently given particular care and attention to things done and to be done, and yet in the preparation and filing of his Federal income tax returns we find him completely out of character. Year after year he filed erroneous returns, admittedly understating income in substantial amounts. For the year 1925 he failed to report a profit of $14,075.50 from two sales of public utility stocks, and for 1926 he failed to report a profit of $1,702.50 from the sale of certain option warrants. With respect to the sale of Southeastern and Commonwealth stocks, he understated his profit for the year 1926 in the amount of $70,182.53, for the year 1928 in the amount of $41,970.64, and for the year 1929 in the amount of $50,907.41, and for 1930 it is stipulated that the amount of the understatement was $209,040.34. It appears also that for the year 1929 his net income was further understated in the amount of $69,120 by reason of his claiming a deduction to which he was not entitled.

The understatement of the profit from the sale of Southeastern and Commonwealth shares for the years 1926, 1928, and 1929 resulted from petitioner's failure to apply the so-called first in, first out rule in determining the basis of the shares sold. He used as his basis the highest price which had been paid for such stock, regardless of the fact that the certificates delivered upon the said sales did not evidence shares purchased at the highest price but evidenced shares purchased at prices not then determinable. The erroneous deduction of $69,120 claimed in 1929 resulted from the fact that petitioner ignored the so-called "wash sales" provision of the statute and claimed a deductible loss on the sale of 2,000 shares of Atlantic Ice & Coal Co. common stock sold on November 25, 1929, even though on December 12 of the same year he entered into an agreement with the purchaser to repurchase the said shares at the same price at which they had been sold. As to the failure to report the profit from the

sales of the utilities stocks and option warrants in 1925 and 1926, the only explanation is that it must have been an oversight. The understatement of profit from sales of Southeastern and Commonwealth shares in 1930, like the understatement of profit on similar sales in 1926, 1928, and 1929, resulted from the use of an erroneous basis, but unlike the errors in those years the understatement of such profit for 1930 resulted from the use of an amount as basis which petitioner now admits he knew he had no right to use. His explanation is that he was negligent and careless, but that he had no intent to evade tax.

It is the claim of the petitioner that he never heard of the first in, first out rule until the investigation was made which resulted in the determination of the deficiencies and penalties herein. He claims that he was under the impression that he could use as the basis for determining the gain from the sale of any shares of stock the highest prices paid for such shares, regardless of the fact that the certificates used in making the transfer of the shares sold were not the certificates received at the time the highest-priced purchases were made. With respect to the loss deduction claimed in respect of the Atlantic Ice & Coal Co. stock, his explanation is that it was his belief that once he had sold the stock his right to deduct any loss sustained was established, regardless of the time of any repurchase agreement on his part.

To say the least, it is difficult to understand how a man of the type portrayed by this record could or would have failed to make some serious effort to have informed himself, or at least have required the person to whom he delegated the task of preparing his income tax schedules to familiarize himself with the proper and established method of determining the basis and computing the gain or loss from the sales of securities, particularly where the purchases and sales in question and the gain realized therefrom were so substantial in amount both as to the number of transactions and the sums of money involved and occupied such an important place in petitioner's personal and financial program. It is not so startling or surprising, however, that any person should have difficulty in understanding and applying the first in, first out rule. Considered in the most charitable light, it is arbitrary and artificial. It rests on the assumption that one share of stock in a particular corporation is identifiable or different from other shares of stock of the same class and ignores the fact that a share of stock is merely indicative of the undivided interest of the holder in the welfare of the corporation, and that the certificate is not a share in itself but merely evidences ownership of such undivided or pro rata interest, not in some particular asset or activity of the corporation, but in the corporation as a whole. The application of the

rule has resulted in a mad scramble on the part of taxpayers to earmark particular stock certificates and in case of sale to use certificates received at the time the highest-priced shares were acquired so as to report the minimum amount of gain or to obtain the maximum deduction in the case of loss. The Government, on the other hand, if the early purchases were made at a lower figure, undertakes to show that the certificates used with respect to a particular sale were certificates evidencing unidentifiable shares and that the first in, first out rule should apply. The natural consequence is that income is distorted year after year, in some instances at the expense of the Government and in other instances at the expense of the taxpayers, and the Bureau, the Board, and the courts are flooded with cases the majority of which would undoubtedly be eliminated to the eventual advantage of both the Government and the taxpayers if it were permissible to determine the basis of the shares sold by the apparent and logical method of averaging the unrecovered cost of all shares owned by the taxpayer immediately prior to a sale. The regulation establishing the first in, first out rule is a regulation of long standing, however, and, since its promulgation has been held to be reasonable under the statute, it has the force and effect of law and it is likely that action by Congress would be necessary to change it. Furthermore, it is our duty to undertake the application of the law as it exists and not as it might or in our opinion should be.

While the petitioner's use of the highest-priced shares in his portfolio as the basis for computing gain is no more reasonable or logical than the application of the first in, first out rule, it is certainly no less so. It does not appear of record that the instructions accompanying the income tax forms contained any information concerning the said rule, and, in the face of petitioner's insistence that he had no knowledge of it whatever, the record seems to fall short of a satisfactory showing of an intent to evade tax in reporting the gain on the transactions in question.

It is with greater difficulty that I am able to give full credence to the testimony with respect to the loss deduction claimed by reason of the sale of the Atlantic Ice & Coal Co. stock. The petitioner certainly was tax conscious, and the record clearly indicates that he would not have parted with the stock except for the purpose of procuring a deduction against income and then only on the belief that he could reacquire such stock at no advance in price. He had no intention or desire to finally and definitely part with his interest in the company. He proposed a sale to Courts & Co., but was able to close the transaction only upon the condition that he would save

them from loss. This was followed some 17 days later by the admitted agreement to repurchase the shares at the selling price. These facts are strongly persuasive that the agreement to repurchase was existent from the beginning but was not expressed until December 12. The witnesses have testified, however, that the sale was an outright sale, and Courts & Co. apparently made some effort to resell the stock to outside interests between November 25 and December 12, and, as to the agreement to indemnify Courts & Co. against loss, there might have been some serious question as to its enforceability, the said agreement not being in writing. These factors, supplemented by the claim of lack of knowledge of the statutory prohibition against the deduction of such losses where a repurchase agreement has been entered into within 30 days after the sale, may be sufficient to justify the conclusion that the record does not sustain the charge of fraud, although it is very difficult to believe that the petitioner could or would have informed himself, as he obviously did, of that part of the statutory provision prohibiting the deduction of such losses if the property sold is actually repurchased within the period of 30 days after the sale and not have informed himself of the prohibition of the loss deduction where an agreement to repurchase is entered into within that period.

Petitioner's failure to make any report of the gain from certain sales of securities in 1925 and 1926 is equally difficult to understand. He had no explanation except that it must have been an oversight, reiterating his claim that he had no intent to evade tax. Compared with other items involved in this proceeding, the amounts were comparatively small and it may be, as counsel suggests, that the omission of the larger amount in 1925 was due to a mistake as to basis and confusion as to sales and purchases made at or about the same time.

With respect to the understatement of income for 1930, however, I am fully convinced from the testimony of both petitioner and Nabors that petitioner's conduct goes far beyond carelessness or negligence and indicates an intent to evade tax within the meaning of the statute. The amount of the understatement was substantially greater than the combined understatements for the preceding years. Both Nabors and petitioner admit they knew they had no right to use as the basis for determining gain on the 1930 sales the cost of stock which had already been exhausted in reporting gain on prior sales, and yet they did just that. I am unable to give credence to the claim or testimony that it resulted from an innocent mistake and agree fully with views expressed in the majority opinion.

LEECH, dissenting: Fraud must be established by clear and convincing evidence. *Charles E. Mitchell*, 32 B. T. A. 1093. I agree with the majority that no such evidence exists here in petitioner's returns for 1925, 1926, 1928, and 1929. I also find none in the return for 1930.

There may have been negligence in the filing of the returns for each of the years in question. Certainly that was so in the return for 1930. But negligence, alone, does not sustain a finding of fraud. *Griffiths* v. *Commissioner*, 50 Fed. (2d) 782; *L. A. Meraux*, 38 B. T. A. 200; *Harold B. Franklin*, 34 B. T. A. 927; *Oscar G. Joseph*, 32 B. T. A. 1192.

Petitioner was a church leader, prominent in the Boy Scout movement, relief work, and similar community activities. He was a very busy executive and engineer. His returns for 1930 and several prior years were prepared by a trusted employee, Nabors, in whose honesty and ability petitioner had absolute confidence, which clearly was not unjustified, though Nabors was not an accountant. Petitioner did not examine the computations on any of the returns. Respondent's agents investigated those for 1930 and for other years, and constructively approved them. Nothing was concealed from these agents then or in their later investigation. All of petitioner's data, supporting the returns, was made available to them. See *Harold B. Franklin, supra; John Thomas Smith*, 40 B. T. A. 387. Though there were omissions of three sales of securities for 1925 and 1926, every sale petitioner made in 1930—and there were 35—was reported in his return for that year. His receipts therefrom were *all* correctly reported except for a small *overstatement*. The error which resulted in the understatement of income upon which the deficiency for that year mainly arose and upon which the finding of fraud in this proceeding was made, was the use of the wrong basis for computing the gain petitioner realized on these sales.

It is now conceded that the proper basis was not used in that computation. After seven months' investigation by respondent, the computation of gain on these sales and those for the earlier years involved, was completed. But this computation exceeded the amount later stipulated as correct, by the amount of approximately $70,000. A tax specialist in the employ of petitioner then spent several months on another computation of petitioner's income, for the several years here in review, which computation respondent accepted as correct, with only minor changes, after investigation, and determined the present deficiencies thereon. The income thus computed is here stipulated as correct. Those facts indicate the complexity of the necessary computation. But that extreme complexity is even more graphically and startlingly evidenced.

Petitioner's income for each of the years here, *as thus stipulated*, is shown, upon the face of the record, to be incorrect and overstated in a large amount because of the use of an erroneous basis for the stock then sold. The majority opinion admits the existence of this error and directs that it be corrected. In the face of this condition, can it be doubted that the computation of the correct basis of the stock sold in each of these years, is a matter so technical and involved that an error, resulting in a large understatement or overstatement of income could be made honestly and without fraudulent intent? Certainly the respondent had no intent to overstate petitioner's income for 1930, and yet, the basis used by his accountants after months of detailed work, with all the records before them, resulted in a computation of income in an amount of $70,000 in excess of the income finally stipulated. And that figure, thus agreed upon, as I calculate it, is about $44,000 in excess of the correct income.

But the majority says that even this error by respondent "does not in the slightest degree affect the issue of fraud." This may be theoretically true when the finding of fraud is limited to the narrow one of petitioner's use, for the second time, of a cost basis for the so-called 5,000-share lot. But is it true, in fact—in view of the peculiar complexity of the calculation of basis for this stock? I think not.

This record convinces me that when the return for 1930 was filed, neither petitioner nor Nabors knew they were using a cost basis that had already been exhausted. The basis thus used was, indeed, wrong. But, error in such a complicated computation—not even yet correctly made—is surely no basis here for a finding of fraud. And the fact that this error actually resulted in the use of a cost basis already exhausted—in the picture presented—is, at least, far removed from "clear and convincing evidence" of fraud.

Petitioner and Nabors now admit that the use of such basis was a mistake, but they both categorically deny they knew they were making this mistake when the return was prepared and filed. Nevertheless, the majority regards petitioner's explanation that this error was an unintentional mistake, as unsatisfactory. They dismiss it with that brief comment.

In view of everything revealed in this record, I think, it was amply sufficient to answer the imputation of fraud. It is significant that the District Court of the Middle District of Georgia, in determining a similar issue for 1931, thought so too. The petitioner had acquired these stocks in an effort to build an estate. All of his 1930 sales were made to pay obligations. In 1929, he was worth $3,000,000. By 1930, the value of his net estate had shrunk to $100,000. He was not a tax expert. Under such circumstances, is it reasonable that he should have known he was in receipt of income during that year,

in an amount much larger than his total net estate? Although the information from which the calculation was made, was always available to respondent, the same exhausted basis was used for the third and fourth times in his returns for 1931, 1932, and 1933. In computing the gain on the sales of Commonwealth stock during those years, Nabors testified he had lost sight of the 5,000-share block and used such mistaken basis because, when he prepared the returns for those years, he had that figure firmly fixed in his mind as the cost, per share, of all the remaining Commonwealth stock. A deficiency and fraud penalty thereon were determined for 1931. Petitioner paid both of them and sued in the District Court of the United States for the Middle District of Georgia, to recover part of the deficiency and all of the 50 percent penalty for alleged fraud. Because of this consistent and continuous error of basis the understatement of income for that year was much greater even than that for 1930. It is true more detailed evidence was presented in this proceeding. Only the year 1931 was there involved, but the issue was the same as that upon which fraud has been found here—petitioner's use of a cost basis in computing gain on sales, which basis had been exhausted by prior sales. The case was tried before the court, without a jury, and the court there had before it the fact that, in petitioner's return for 1931, in computing his gain on sales of Commonwealth stock during that year, the petitioner had used as a basis therefor a cost of stock which had already been used in computing gains on sales made before 1930. It was not there noted, however, that the basis used even by the respondent in computing the contested income was wrong. Yet the court, at the conclusion of the trial, said in part, and included the same in its findings of fact:

THE COURT. I want to say, and I feel that it is only fair to Mr. Mitchell that I say it now; that is, any charge of fraud in the sense that is generally understood as being dishonest and for the purpose of evading the payment of taxes, as I understand it, is certainly not sustained in this case and I do not hesitate to actually and promptly find against that contention now. If it means negligence there is room for argument probably that Mr. Mitchell, with his occupation and the many other duties in which he took part, might not have found time to go more thoroughly into the matter. That need not be determined now; nor am I going into the question of the alleged Huntington Aircraft loss. But I am announcing now that I am so thoroughly in sympathy with his feeling of outrage at being charged with fraud and dishonesty that I take pleasure in making this statement at this time and I will incorporate it in my findings.

I do not think the record here warrants any different conclusion as to the year 1930.