JOHN E. BAYLOR and RUTH W. BAYLOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baylor v. Commissioner
Docket No. 7731-75.
United States Tax Court
T.C. Memo 1977-253; 1977 Tax Ct. Memo LEXIS 189; 36 T.C.M. (CCH) 1026; T.C.M. (RIA) 770253; August 2, 1977, Filed *189 P understated his income for the years 1966 and 1967. His 1967 return was filed late, but the delinquency penalty was waived. Held: (1) P's under-statements of income were due to "fraud" within the meaning of sec. 6653(b), I.R.C. 1954. (2) P's 1967 return was not filed within the prescribed period for purposes of sec. 6653(c), I.R.C. 1954; accordingly, the tax shown therein does not reduce the amount of the underpayment on which the addition to the tax is imposed. John E. Baylor and Ruth W. Baylor, pro se. Thomas G. Schleier, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Sec. 6653(b) [1] Year
Deficiency
Addition
1966
$1,368.83
$2,583.32
1967
--
11,946.66
As a result of mutual concessions by the parties, the only issues remaining for decision are: (1) Whether any part of the petitioners' underpayment of tax for the years in issue was due to fraud within the meaning of section 6653(b); and if so (2) whether the petitioners' joint 1967 Federal income tax return was filed "on or before the last day prescribed" within the meaning of section 6653(c)(1), so that the tax liability shown thereon may be considered in computing their underpayment for such year. FINDINGS *191 OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, John E. Baylor and Ruth W. Baylor, husband and wife, resided in Northfield, Ill., when they timely filed their petition herein. Their joint Federal income tax return for 1966 was filed with the Internal Revenue Service on April 15, 1967. They filed a joint Federal income tax return for 1967 on June 18, 1968, with the District Director of Internal Revenue, Chicago, Ill. On March 5, 1969, the petitioners filed an amended tax return for 1966, and on March 6, 1969, they filed an amended return for 1967. During the years in issue, the peitioner, John E. Baylor, was a practicing physician, specializing in the field of urology. He maintained two offices; his primary office was located in Evanston, Ill., but he spent 1 day a week in his office in Chicago. He was also associated with three hospitals: the Swedish Covenant, the Evanston, and the Ravenswood. The principal business records kept by Dr. Baylor were of two types: a patient ledger card which listed each time a patient visited him, the fees charged, and the amounts received; and a day book which recorded for a particular year *192 the patients who were treated, those who made payments, and the amounts thereof. Most of the recordkeeping was done by his secretary in accordance with his instructions and under his supervision. For example, in accordance with his instructions, the initials "B.S." were written in red in the day book next to a payment made on behalf of a patient by Blue Shield. The secretary was also instructed by Dr. Baylor to keep Blue Shield checks separate from other receipts. During the years in issue, Dr. Baylor took such checks and gave them to his wife. The bulk of such checks was deposited in her separate checking account--some directly, and others were first converted into cashier's checks or money orders and then deposited in such account. Dr. Baylor explained that he gave his wife such checks because it was a convenient way of funding household expenses, and he also said that such funds were the source of her spending money. Dr. Baylor maintained a checking account at the Harris Bank and Trust Co., which he used for his business receipts. He deposited all of his checks into such account except for those he received from Blue Shield. However, he did not deposit the cash payments *193 received by him; they were recorded in the day books and then turned over to Dr. Baylor. For the years in issue, as well as for some prior years, Dr. Baylor did not compute his income by totaling the gross receipts as reflected in the day books; instead, according to Dr. Baylor's testimony, he computed his income for each year in the following manner: He first ascertained the total deposits made to his checking account during the year; to such total, he added the amount of cash payments received by him as reflected in the day book for the year and checks received during the year but not deposited until the following year; from the total so obtained, he subtracted deposits which did not represent income and checks which were received in a prior year but deposited during the present year. The amount of non-income items did not exceed $1,000 during 1965 or 1966. For the years at issue, Dr. Baylor's day books correctly reflected his gross receipts from the practice of medicine. However, by use of his method of accounting, he reported gross receipts from his medical practice of $73,064 for 1966 and $76,342 for 1967. Such amounts understated Dr. Baylor's actual gross receipts by $8,907.91 *194 in 1966 and $4,819.66 in 1967. Dr. Baylor's day books reflect the receipt of Blue Shield payments amounting to $7,827.00 in 1966 and $11,245.67 in 1967. When agents of the Commissioner attempted to follow the accounting method outlined by Dr. Baylor for computing his gross receipts, their results differed considerably from those reported by him, and they were unable to reconcile the differences. A special agent found that had Dr. Baylor followed his suggested accounting method and included therein Blue Shield payments as reflected on the Forms 1099 received by him, the results would have been very nearly correct. On February 3, 1969, Dr. Baylor was visited by a revenue agent and a special agent of the Internal Revenue Service regarding his tax returns for 1965 and 1966. During that meeting, Dr. Baylor told the agents that to the best of his knowledge, his returns for those years accurately reflected his income. He agreed to allow them to inspect his records, including his day books, at his Evanston office, although he would not be able to be there. When the agents went to his Evanston office on the agreed date, most of Dr. Baylor's records were there, but not his day books. *195 When the special agent called Dr. Baylor and told him of his particular interest in the day books, Dr. Baylor stated that he thought it would not be necessary to inspect the day books if everything else checked out but invited the agents to return to his office at a later date. The agents returned on February 10, 1969, at which time Dr. Baylor presented them with various records relating to his stock account and bank account. After they inspected such documents, the special agent asked for his day books, and Dr. Baylor presented his day book for 1966. After a short examination of it, the special agent asked Dr. Baylor why the day book did not contain daily, monthly, or annual totals. Dr. Baylor explained that such totals were unnecessary in light of his method of computing gross receipts. Thereupon, the agent inquired whether Dr. Baylor had an adding machine, and Dr. Baylor replied that he did not. The agent desired to remove the day book and take it to an IRS office where he would have access to an adding machine, but Dr. Baylor refused to allow him to do so, explaining that he did not think it prudent to allow the book to leave his office. However, Dr. Baylor agreed to allow *196 the agents to examine the day book as much as they wanted in the office. The agents then computed the amounts received by Dr. Baylor for each day. While the agents were making such computations, the revenue agent noticed the initials "B.S." appearing in red ink on several pages and asked Dr. Baylor to explain them. Dr. Baylor replied that he had no idea what they stood for; he did not know why they were written in red ink; and he did not know whether they were made by the secretary. At approximately 4:45 p.m., the interview ended with the agents explaining to Dr. Baylor that on the next day, they would add up the daily totals computed by them to calculate total recorded receipts. On the night of February 10, 1969, at about 9:05 p.m., Dr. Baylor called the special agent at home. Dr. Baylor said to the special agent that he had "big problems" because it just occurred to him that he inadvertently failed to report all of his income on his tax returns for the past several years. He stated that he gave his Blue Shield checks to his wife, and because of his method of calculating gross receipts, he omitted such checks in error on his returns for 1965, 1966, and 1967. It first "hit *197 him" that such amounts were not reported shortly after the agents left the office, although he could not imagine why it took him so many years to realize the mistake. In a subsequent meeting with the agents, Dr. Baylor admitted that he instructed his secretary to identify Blue Shield receipts by the initials "B.S." in red ink, but claimed that he did not remember such facts during his prior meeting with the agents. He also acknowledged that he was aware such receipts were taxable and that he had a workable knowledge of accounting and income tax law. Dr. Baylor used the same method of computing his gross receipts, omitting his receipts from Blue Shield, for 1965 as well as for the years in issue. It was shortly after Dr. Baylor's interview with the agents on February 24, 1969, in early March 1969, that he filed the amended returns for 1966 and 1967. In February 1972, Dr. Baylor was indicted on three counts of attempted tax evasion for 1965, 1966, and 1967. He pled guilty to attempted tax evasion for 1965 and, in December 1972, was convicted on such offense. He was sentenced to 10 months imprisonment and a fine of $10,000. Upon the motion of the United States, the other counts *198 of the indictment were dismissed. The petitioners never requested nor received an extension of the time for filing their 1967 Federal income tax return. When such return was filed on June 18, 1968, it was accompanied by a letter from them, stating that the delay in filing was due to the fact that they could not file the return on time because they had not yet received certain necessary information concerning the John E. Baylor Pension Plan from the Equitable Life Assurance Society. There was attached a letter from such insurance company, dated May 3, 1968, furnishing the necessary information. Subsequently, the Commissioner asserted a delinquency penalty under section 6651(a), but later, such penalty was abated by an employee of the Midwest Service Center, stating "Abate delinquency penalty--Reasonable cause shown." In his notice of deficiency, the Commissioner determined Dr. Baylor's gross receipts for the years in issue and made other adjustments which the parties have settled. He also determined an addition to tax for fraud for such years. In computing the underpayment on which to impose such additions to the tax, he gave the petitioners credit for the total amount of tax *199 shown on their original 1966 return; but he did not allow them any credit for the total amount of tax shown on their original 1967 return because it was not timely. The Commissioner now concedes that Mrs. Baylor is not liable for the fraud penalty. The primary issue for decision is whether any part of the underpayment of taxes for the years in issue was due to fraud by Dr. Baylor within the meaning of section 6653(b). [2]The Commissioner bears the burden of establishing fraud. Sec. 7454(a). He must prove fraud by clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure; Archer v. Commissioner,227 F. 2d 270 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; Fox v. Commissioner,61 T.C. 704 (1974); Beaver v. Commissioner,55 T.C. 85, 92 (1970). To establish fraud, the Commissioner must show that the taxpayer deliberately intended to evade the payment of taxes, which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), *200 cert. denied 393 U.S. 1020 (1969); Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941), revg. and remg. 40 B.T.A. 424 (1939), supp. opinion 45 B.T.A. 822 (1941); Acker v. Commissioner,26 T.C. 107, 112-113 (1956). The issue of fraud poses a factual question which is to be determined upon an examination of all the evidence in the record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Irolla v. United States,390 F. 2d 951, 953 (Ct. Cl. 1968); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969).
After examining and evaluating the facts of record, we hold that the Commissioner has met his burden of proof and has clearly and convincingly demonstrated *201 that some part of the understatement was due to fraud by Dr. Baylor. Dr. Baylor was a well educated man with a workable knowledge of accounting and tax matters. He freely admits that he knew the Blue Shield payments constituted taxable gross receipts, but he claims that he was not deliberately and fraudulently omitting such receipts from his income; he says that they were inadvertently omitted. Dr. Baylor's explanation does not withstand critical scrutiny based on the facts and circumstances surrounding his omissions. He pled guilty to, and was convicted of, attempted tax evasion for 1965, a year when he followed the same accounting procedures as he did in the two subsequent years which are before us. He admitted to the Commissioner's agents that the source of his understatement during 1965 was the same as during the years before us. Under such circumstances, his conviction for 1965, while not giving rise to an estoppel, certainly is evidence that his omissions were not merely inadvertent, and that he was engaged in a course of conduct to evade his full tax liability. Cf. Rule 404(b), Fed. R. Evid.
In addition, the circuitous and devious manner in which Dr. Baylor handled *202 the Blue Shield receipts, in our judgment, is indicative of his attempt to avoid making a record of such receipts. See Spies v. United States,317 U.S. 492, 499 (1943); Funk v. Commissioner,29 T.C. 279, 293-294 (1957), affd. on this ground sub nom. Furnish v. Commissioner,262 F. 2d 727 (9th Cir. 1958); Reichert v. Commissioner,19 T.C. 1027, 1039 (1953), affd. on other grounds 214 F. 2d 19 (7th Cir. 1954), cert. denied 348 U.S. 909 (1955). He did not deposit such checks in his bank account (which he says was used as the basis for computing his taxable income), as he did with all other checks; instead, he circumvented his bank account and gave such checks to his wife. He claims that he did so simply as a convenient way of giving his wife spending money, but fails to explain why he did not directly write checks on his account for such amounts. Furthermore, Mrs. Baylor's roundabout action in obtaining money orders or cashier's checks for the Blue Shield checks and then depositing them in her account, rather than directly depositing them into her account, appears to be explainable *203 only if there was an attempt to conceal the source of such deposits; the petitioners have offered no reason for "laundering" the deposits in that fashion. Dr. Baylor's method of calculating his gross receipts is further evidence, in this case, of his attempt to fraudulently evade the payment of his taxes. He was sophisticated enough to have known, and did know, that he need only total the receipts shown in his day books in order to compute his annual receipts. However, he chose to follow an awkward and convoluted method based on his deposited receipts to which he made numerous adjustments. He claims that such method was far easier, but in fact, its use resulted in more difficulties. Even Dr. Baylor recognized that he had to use his day books to ascertain the amount of cash payments received during the year. Obviously, it would have been much simpler to have used the day books to obtain the total receipts rather than to use them merely for that purpose and to base income on bank deposits with numerous adjustments. Moreover, Dr. Baylor had, for each year in issue, a Form 1099 which stated the amount of Blue Shield receipts he received. Although he now claims that he took such *204 forms into account when he prepared his returns, he admitted to the agents that he failed to include such receipts in gross income, and the income reported by him for the years in issue refutes his present claim. Dr. Baylor's failure to deposit his Blue Shield receipts--combined with his failure to add such amounts to his bank deposits even though he made numerous other adjustments to his bank deposits to arrive at gross receipts, some of which were far more sophisticated--persuades us that the omissions were consciously and knowingly done, and that his method of calculating income was merely a ploy, designed to provide him with the colorable excuse for his omissions from income. See Spies v. United States,supra; Funk v. Commissioner,supra; Reichert v. Commissioner,supra.
Dr. Baylor continued his attempts to conceal his income and evade taxes when the IRS agents commenced their investigation of him, and such attempts constitute additional evidence of fraud on his part. See Powell v. Granquist,supra; Barcott v. United States,169 F. 2d 929 (9th Cir. 1948); Irolla v. United States,supra; *205 Beaver v. Commissioner,supra. When Dr. Baylor was initially interviewed by the agents, he claimed that so far as he knew, his returns clearly reflected his income. Although he adopted a cooperative attitude toward the agents, he failed to make his day books available to them until pressed to do so, and when he did make them available, he did so under such conditions as to make it difficult for the agents to compute gross receipts reflected on the day books. In the light of this record, we are convinced that there is no innocent explanation for such circumstances; and when taken into consideration with all the facts of record, such conduct furnishes further evidence of a fraudulent purpose on the part of Dr. Baylor. Hence, we conclude that for each year in issue, some part of the underpayment was due to "fraud" on the part of Dr. Baylor within the meaning of section 6653(b). Having so concluded, we must now decide how the addition to tax for fraud is to be computed for the year 1967. In the case of fraud, section 6653(b) imposes an addition to the tax of an amount *206 equal to 50 percent of the "underpayment" as defined in section 6653(c). Section 6653(c) defines an "underpayment" of income taxes to mean generally a deficiency as defined in section 6211. In computing whether there is a deficiency under section 6211(a)(1)(A), the amount of tax shown on a taxpayer's return is subtracted from the total correct tax liability. However, section 6653(c) provides that in computing an "underpayment" on which to impose the addition to the tax, the amount shown on a taxpayer's return will be subtracted from the total tax liability only if "such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing." Thus, unless a return is timely, the addition to the tax for fraud will be imposed on the total amount of tax liability for the year without any reduction for the amount shown on the return. The purpose of the statutory requirement of a timely return is to prevent an easy circumvention of the fraud penalty in cases where no return, or fraudulent return, is initially filed. In those situations, if the tax shown on the untimely or amended return could reduce or eliminate *207 any "underpayment," then the fraud penalty could accordingly be reduced r eliminated. Such a situation would make a "sport of the so-called fraud penalty" ( George M. Still, Inc. v. Commissioner,19 T.C. 1072, 1077 (1953), affd. per curiam 218 F. 2d 639 (2d Cir. 1955)) because a taxpayer who had filed a fraudulent return, or no return, would merely file an amended or a late return when it became clear the IRS was aware of the facts. See Papa v. Commissioner,464 F. 2d 150, 153 (2d Cir. 1972), revg. a Memorandum Opinion of this Court; Stewart v. Commissioner,66 T.C. 54, 58-59, 61 & n. 6 (1976); George M. Still, Inc. v. Commissioner,supra; Wilson v. Commissioner,7 T.C. 395, 398 (1946); see also Levinson v. United States,496 F. 2d 651, 654-655 (3d Cir. 1974). Yet, the statute adopts a mechanical rule based on the timeliness of a return for determining whether the tax shown therein will reduce the amount of an underpayment; and the statute is not limited only to those *208 situations wherein a taxpayer may have sent in a return with the intent of thwarting the fraud penalty. In this case, the petitioners' 1967 Federal income tax return was due on or before April 15, 1968. However, it was not filed with the IRS until June 18, 1968, and the petitioners never requested, nor received, an extension of time for filing such return. Thus, it is apparent that their 1967 return was not filed "on or before the last day prescribed for the filing of such return," since there was no extension of time for doing so. The petitioners attempt to avoid the clear wording and meaning of the statute by arguing that their return should be considered timely since the IRS abated the delinquency penalty upon its determination that reasonable cause was shown for the lateness. The petitioners' contention must be rejected. The wording of section 6653(c) clearly requires that a return be filed timely, including extensions of time for filing, and makes no exception for a return not filed timely even when the failure to do so may be due to reasonable cause. Moreover, section 6651(a) *209 imposes the delinquency penalty in the case of a taxpayer's failure "to file any return * * * on the date prescribed therefor (determined with regard to any extension of time for filing)." Such section also provides that such addition to the tax will not be imposed if "it is shown that such failure is due to reasonable cause and not due to willful neglect." (Emphasis supplied.) Thus, when reasonable cause is shown, the penalty is waived, but there is no suggestion that the return is to be treated as filed timely. Finally, although though the Commissioner abated the delinquency penalty * in this case, apparently because he concluded that reasonable cause had been shown for the failure to file on time, such a conclusion is merely an administrative one, and there has been no judicial finding that the failure to file timely was due to reasonable cause. In fact, although the need for the information from the insurance company may have provided grounds for requesting an extension of time and may have justified some delay in filing the return, there is no apparent justification for the petitioners' failure to file their return until June 18, 1968; they received the needed information *210 from the insurance company in early May, and there was no apparent explanation as to why they waited until June to file the return. Accordingly, we hold that the tax shown on the petitioners' untimely 1967 return does not reduce the amount of the underpayment. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *↩