Walde W. Kane and Lourene A. Kane v. Commissioner.
Kane v. Commissioner
Docket No. 60765.
United States Tax Court
T.C. Memo 1959-111; 1959 Tax Ct. Memo LEXIS 135; 18 T.C.M. (CCH) 492; T.C.M. (RIA) 59111; May 28, 1959
*135 Held: 1. Respondent was justified in making use of the net worth plus nondeductible expenditures method in reconstructing petitioners' net income for each of the years in issue under the circumstances of this case. 2. Respondent correctly determined the deficiencies for the years in issue. 3. No part of the deficiencies for any of the years in issue was shown to have been due to fraud with intent to evade tax. 4. Section 275(c), I.R.C. 1939, is not applicable to the years 1946 and 1947. 5. The deficiencies and additions to tax for the years 1946 and 1947 are barred by limitations. 6. Additions to tax under section 294(d)(2) for the years 1949 and 1950 are sustained. Roy C. LaBudde, Esq., for the petitioners. James T. Wilkes, Jr., Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax of petitioners and additions to tax as follows: Addition to Tax
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(2)
1946
$2,704.19
$1,352.10
$ 162.25
1947
7,245.71
3,622.86
434.75
1949
1,748.84
814.26
97.71
1950
958.28
575.57
52.26
1951
201.14
100.57
none The deficiencies result from respondent's determination that petitioners' taxable net income for *136 each of the years in question, computed upon the basis of increases in net worth during the taxable years with adjustments for personal and other nondeductible amounts paid, exceeded the income reported for each of such years. The additions to tax result from respondent's determination that a part of the deficiency for each of the years in issue was due to fraud with intent to evade tax, under section 293(b) of the Internal Revenue Code of 1939, and of substantial underestimate of estimated tax for each of the years 1946, 1947, 1949, and 1950, under section 294(d)(2) of said Code. Petitioners have pleaded limitations with respect to the years 1946 and 1947, under section 275(a) of the 1939 Code. Respondent, on the other hand, has affirmatively alleged the filing of false or fraudulent returns with intent to evade tax with respect to such years (section 276(a), I.R.C. 1939), and also the omission from gross income of an amount properly includible therein in excess of 25 per cent of the gross income stated in the returns (section 275(c), I.R.C. 1939), together with the execution of a series of waivers (section 276(b), I.R.C. 1939). In addition to the limitations question, petitioners *137 have alleged respondent erred in resorting to the net worth method and, alternatively, in failing to give recognition to some $42,700 alleged cash on hand as of the beginning of the net worth period, in determining living expenses and in adding 10 per cent to the cost of machinery as "cost of installation." The principal issues presented for our determination are: 1) Whether respondent properly resorted to and applied the net worth method in determining the net income of the petitioners for each of the years 1946, 1947, 1949, 1950, and 1951; 2) Whether any part of the deficiency for each of the years in issue was due to fraud with intent to evade tax; 3) Whether petitioners are liable for additions to tax, under section 294(d)(2) I.R.C. 1939, for each of the years 1946, 1947, 1949 and 1950; and 4) Whether the assessment and collection of the deficiency and additions to tax, for each of the years 1946 and 1947, are barred by limitations. Findings of Fact The stipulated facts and attached exhibits are incorporated herein by this reference. During the years in issue petitioners Walde W. Kane (hereinafter referred to as Kane) and Lourene A. Kane were husband and wife residing in Port Washington, *138 Wisconsin. For each of the years 1946, 1947, and 1949 to 1951, inclusive, petitioners timely filed a joint Federal income tax return with the then collector of internal revenue for the district of Wisconsin, and duly paid the amount of tax shown thereon. Lourene's parents, August and Anna Budahn, were married in 1896. Anna Budahn was born in Germany and came to this country as a young girl. Throughout their married life the Budahns lived in or near Marshfield, Wisconsin. They had three children, Leo, Lourene and Arthur, who were born in the years 1897, 1900, and 1906, respectively. After they were married and until about the year 1900 the Budahns lived in an apartment above one of their parents' homes. About 1900 the Budahns purchased a two-family home in Marshfield. They occupied the lower level and rented the upper. They resided at this home until 1907, when they purchased a seven-acre tract on the outskirts of Marshfield and rented approximately 55 additional acres. They erected a home on the seven-acre tract and borrowed $700 in connection with the purchase and improvement of the land. After moving to the outskirts the Budahns acquired some cattle and sold milk and other farm *139 produce. The farm was sold in 1918 for $6,000. The cattle and farm machinery were sold separately at this time at an auction. About 1905 August Budahn became street commissioner of Marshfield and held that position approximately 18 years. When the Budahns moved to the farm in 1907 they retained their residence in Marshfield and rented both apartments. After selling the farm in 1918 they moved back to the residence in Marshfield, did some remodeling and rented rooms to tourists. The prices charged for room rents ranged from one to three dollars per person, depending upon how many occupied a room. The house had about five bedrooms, and rooms were rented to tourists from 1918 to 1942. Anna Budahn made loans secured by mortgages as follows: Date
Mortgagor
Amount
Aug. 11, 1921
Fred E. and Mary
Graham
$3,000
Aug. 11, 1921
Davis I. and Irene Hood
1,000
Dec. 21, 1931
Julius O. and Laura M.
Miller
500 Six per cent interest was payable on each of such loans. Some time during the 1930's Anna acquired the property owned by Fred E. Graham as a result of his failure to repay the loan reflected above. The house was rented until 1945, when it was sold. Anna Budahn received an inheritance from her parents in Germany *140 amounting to approximately $300. The State of Wisconsin has no record of any state income tax return having been filed by August and/or Anna Budahn for the years 1919 to 1940, inclusive. Anna Budahn died testate, a resident of Marshfield, Wisconsin, on January 9, 1950. Probate proceedings had in her estate indicated that the decedent owned certain real estate, described as Lot 10, Block 18, in the City of Marshfield, Wood County, Wisconsin, jointly with her husband, August W. Budahn, who survived her. Said real estate was appraised at $7,000 as of the date of Anna Budahn's death. In addition the probate proceedings reflect cash owned by Anna at her death in the total amount of $10,736.54, as follows: Savings account - Central State
Bank, Marshfield
$5,292.04
Savings account - Citizens Na-
tional Bank, Marshfield
4,969.93
Cash on hand
474.57
Total
$10,736.54 Ownership of the said real estate passed to August W. Budahn by right of survivorship under Wisconsin law. Under the will of Anna Budahn the personal property (cash) in the estate was divided into four equal shares after payment of debts, funeral and administrative expenses. On or about July 15, 1950, Lourene received her net distributable *141 share of said estate in the amount of $2,343.88, after payment of the Wisconsin inheritance tax in the amount of $8.40. Lourene's father, August W. Budahn, died intestate on December 13, 1952, in the City of Marshfield, Wisconsin. Probate proceedings in his estate reflect a gross estate appraised at $9,648.62, as follows: Real Estate - Lot 10. Block 18,
City of Marshfield
$8,500.00
Savings Account, Citizens National
Bank, Marshfield
344.62
Furniture, Clothing and Dishes
779.50
United States Series E Bond
24.50
Total
$9,648.62 The real estate was sold pursuant to court order and the final decree in said estate showed assets received by the administrator in the total amount of $9,909.67, less expenses, fees and debts of $2,032.87, leaving a total for distribution of $7,876.80, of which Lourene, on or about June 3, 1953, received the amount of $2,611.68 after payment of the Wisconsin inheritance tax in the amount of $13.92. Lourene was first gainfully employed in 1919 by the Graham Real Estate Company in Marshfield. At this time she was living with the Grahams and supporting herself. Her wages gradually increased to $75 per month. She paid $15 per month for board at the Grahams. On October 11, 1921, *142 Lourene married Kane. They had been married secretly and did not live together after their marriage. On March 3, 1922, Lourene filed a suit for divorce. One of the grounds for such action was nonsupport. Subsequent to the institution of the suit the parties had a reconciliation and no further action was had on this suit. A second divorce action alleging nonsupport was instituted by Lourene on October 15, 1923. A divorce decree was granted on the same day. The daughter of petitioners was born shortly after the divorce. Lourene had been living with her parents about six months prior to the divorce and continued to live with them after the divorce. She received no support from Kane during any of this time. Petitioners were remarried on October 11, 1927. Lourene became employed by the Normington Laundry and Dry Cleaning Company in 1924. She remained there ten years. When she started work for Normington she received a lower wage than that received from Graham. On her Wisconsin state income tax return for the year 1927 Lourene reported gross income from Normington in the amount of $890. Such return also bears a notation that Lourene's net income for 1926 was $850. The total income reported *143 on Wisconsin state income tax returns filed by Walde and/or Lourene Kane for the years 1928 to 1935, inclusive, is as follows: 1928
$ 1,589.75
1929
1,890.25
1930
3,093.92
1931
2,812.59
1932
1,514.18
1933
790.96
997.00
1934
1,674.13
1935 (loss)
3,231.00 The State of Wisconsin has no record of any income tax returns having been filed by either of petitioners for the years 1936 to 1939, inclusive. For the year ended December 31, 1927, on her Wisconsin state income tax return Lourene designated herself as "head of a family." For most of the year 1932 Kane was not working. During the years 1930 to 1934, Kane also worked for Normington. Petitioners left the employ of Normington in 1934 and went to Park Falls, Wisconsin, where, until July 30, 1935, they operated a dry cleaning plant under an arrangement with the First National Bank of that city which had foreclosed its chattel mortgage on the prior operator. Petitioners made no initial investment in this plant but assumed the unpaid balance on the loan to the prior operator in the amount of approximately $3,000. Petitioners operated this plant profitably enough to earn their living expenses until a fire occurred on July 30, 1935, which completely destroyed *144 the plant, equipment, all garments or work in process, and records of the business. The day after the fire petitioners filed a chattel mortgage in favor of Lourene's mother. This mortgage was predated several months and was filed with the idea that there might be various claims and that it would put Anna Budahn ahead of such claims. After the fire petitioners left Park Falls and Kane sold dry cleaning equipment for the Band Box Corporation. He also went into a dry cleaning business known as the Novelty Cleaners in Chippewa Falls, Wisconsin, in partnership with one Herring. Kane did not invest any cash in this business and retained his job with the Band Box. Lourene worked in the plant. In 1940 the petitioners sold their interest in the plant for $1,700. After selling their interest in Novelty Cleaners petitioners moved to Port Washington, and established a dry cleaning plant known as the Port Cleaners. At this time they owned an automobile, some clothing and furniture. They did not purchase any real estate when they first moved to Port Washington but rented an old building as a site for their business. They paid rent for such building in the amount of $18 per month. Petitioners operated *145 their dry cleaning plant on the first floor of this building and had their living quarters on the second floor. In 1943 petitioners purchased the site of their operations and the building thereon for $4,000. In 1945 petitioners, at a cost of approximately $4,500 built another building on this site to house part of their dry cleaning equipment. In addition to erecting the rear plant building petitioners remodeled the old building during the war at a cost of $650 and built a separate garage on the premises at an additional cost of $700. Early in 1947 petitioners contracted to complete the plant by constructing the front part, which was finished that year at a total cost of $16,500. Cleaning and finishing equipment owned by Port Cleaners prior to 1945 had a cost of $680. During the years 1945 to 1947, inclusive, petitioners purchased dry cleaning and finishing equipment and machinery at the following cost: 1945
$7,870.00
1946
4,679.67
1947
5,584.80 The purchase of the new cleaning machinery and equipment increased the cleaning capacity of the Port Cleaners. After petitioners began operating the Port Cleaners both of them worked in the business. Lourene was in charge of keeping the books and *146 records. On a few occasions Kane made some entries in the books. The books of Port Cleaners were essentially a single entry system and as such there were no running cash balances nor accounts reflecting property investments. The principal record of Port Cleaners was a cash disbursements journal containing a weekly summary of sales and cash expenditures in the business. This journal also contained a record of bank deposits and checks drawn. In addition to this journal there were summary sheets containing weekly summaries of sales and cash expenses including employees' salaries and withdrawals by petitioners, employees payroll records and a general ledger in which were posted the annual totals from the cash journal. The summary sheets were totaled weekly and such totals were entered in the cash journal. Such figures in the cash journal were the basis for the amount of sales reported on the petitioners' income tax returns. James Lynch commenced working for petitioners in March 1947. He started working as an apprentice and gradually worked up to the position of manager. Petitioners sold the Port Cleaners to Elmer Adams and James Lynch on June 28, 1952. The selling price of the business *147 was $105,700. The cash payment was $19,200 and the buyers agreed to pay the balance at a rate of $100 per week together with interest at five per cent computed and payable weekly. On their Federal and/or Wisconsin state income tax returns for the years 1940 to June 28, 1952, inclusive, petitioners reported the following amounts of gross sales and net income with respect to Port Cleaners: Year
Gross Sales
Net Income
1940
$ 1,823.04
$ 487.05
1941
4,364.89
632.36
1942
6,233.15
1,525.40
1943
9,726.98
2,192.16
1944
8,871.69
1,948.24
1945
12,606.56
2,916.72
1946
22,920.59
3,599.89
1947
28,142.69
4,115.64
1948
41,414.84
4,891.72
1949
43,200.17
6,884.92
1950
51,059.42
6,928.47
1951
60,410.66
7,185.77
1952 (6 months)
34,260.19
8,818.29
After Adams and Lynch purchased Port Cleaners they began a laundry service and also handled leather cleaning, weaving and dyeing, none of which services was offered by petitioners. They also acquired new dry cleaning customers which petitioners did not have. The gross sales and net profit from the business of the Port Cleaners for the last six months of 1952 and the years 1953 and 1954 were as follows: Year
Gross Sales
Net Income
1952 (6 months)
$36,607.92
$ 8,852.83
1953
87,074.18
25,263.46
1954
86,741.08
21,403.59
The *148 investigation of petitioners' income tax liability for the period here involved began on April 23, 1952, when internal revenue agent Grosse first contacted petitioners. Grosse asked that all of the books and records of the Port Cleaners be delivered to the agent's office at West Bend, Wisconsin, within five or ten days. Within that time petitioners delivered a box of records to Grosse, containing ledger sheets, summary sheets and expense invoices. The weekly sales and expense summaries were not segregated by weeks nor were the sheets of the cash disbursements journal in chronological order. The cash disbursements journal was not delivered at first because it was being used in current operations. In an attempt to audit the books and records of the Port Cleaners, respondent's agents sorted pages of the cash disbursements journal according to year, which was done by means of page numbers on the sheets, the dates of entries made, or in the absence of both of these indices, by matching footings carried over. The agents also sorted the ledger sheets by placing all sheets for the same account together. Grosse attempted to place in chronological order sales and expense summary sheets and the *149 supporting invoices for the expense summaries. After completing this arrangement of the summary sheets Grosse "spot checked" 51 separate weeks as to each of which he had put together all of the sales and expense summary sheets. In checking the sales summaries he found that 36 out of the 51 weeks would not "tie in" to the cash disbursements journal but the sales summaries for the other 15 weeks did tie in. He traced the expenses on the summary sheets into the cash disbursements journal. The weekly expense summaries checked for all weeks but one. However, supporting invoices for such expenses were not complete. From his examination of the records presented to him Grosse concluded that the books and records of the Port Cleaners did not correctly reflect income. At this time he decided to complete the audit by use of the net worth method. After deciding to determine petitioners' income by the "net worth" method respondent's agents made various investigations and had conferences with petitioners and their representatives to determine the amounts properly to be used in the net worth statement. As a result of such inquiries respondent arrived at a determination of petitioners' taxable income *150 by use of the net worth plus nondeductible expenditures method. The following schedule reflects respondent's net worth statement: Dec. 31, 1945
Dec. 31, 1946
Dec. 31, 1947
Dec. 31, 1948
ASSETS
Cash on Hand
$ 235.00
$ 235.00
$ 235.00
$ 235.00
Cash in Banks
1,156.22
3,386.31
1,458.34
971.28
Accounts Receivable
279.97
585.16
1,086.50
888.50
Land Contract
Supplies Inventory
888.75
1,170.50
1,231.30
1,433.65
Machinery & Equipment
9,405.00
14,552.64
20,695.92
21,789.74
Business Trucks &
792.00
1,135.00
1,135.00
2,505.00
Automobiles
Business Land &
9,850.00
9,850.00
26,350.00
26,350.00
Buildings
Prepaid Business
232.02
227.83
185.06
515.38
Insurance
Business Goodwill
375.00
375.00
375.00
375.00
Personal Property -
Lake Land &
3,025.00
5,131.00
6,131.00
6,821.00
Furnishings
Home Furnishings &
1,850.00
1,850.00
1,850.00
1,850.00
Jewelry
Automobiles
902.00
1,237.00
1,237.00
1,500.00
Total Assets
$28,990.96
$39,735.44
$61,970.12
$65,269.55
LIABILITIES
Allowance for
Depreciation -
Machinery & Equipment
$ 265.72
$ 1,114.52
$ 2,324.54
$ 3,805.91
Truck & Automobile
792.00
70.94
354.69
952.40
Buildings
142.00
298.00
619.00
1,105.00
Total Liabilities
$ 1,199.72
$ 1,483.46
$ 3,298.23
$ 5,863.31
$27,791.24
$38,251.98
$58,671.89
$59,406.24
Dec. 31, 1946
Dec. 31, 1947
Dec. 31, 1948
NET WORTH
Increase in Net Worth
$10,460.74
$20,419.91
$ 734.35
Estimate Cost of Living
2,100.00
2,250.00
3,500.00
TOTAL
$12,560.74
$22,669.91
$ 4,234.35
Less: Inheritance
Total
$12,560.74
$22,669.91
$ 4,234.35
Plus: Federal Tax Paid
632.00
450.00
State Tax Paid
28.00
29.93
Personal Loss - Sale of Lake
Property
Corrected adjusted gross income on
$13,220.74
$23,149.84
net worth basis
Adjusted gross income per return
$ 3,599.89
$ 4,115.64
Increase in income
$ 9,620.85
$19,034.20
ASSETS
Dec. 31, 1949
Dec. 31, 1950
Dec. 31, 1951
Cash on Hand
$ 270.00
$ 270.00
$ 270.00
Cash in Banks
4,135.28
6,141.91
9,104.16
Accounts Receivable
778.16
278.09
669.60
Land Contract
6,540.00
6,060.00
Supplies Inventory
1,440.32
2,059.20
2,545.50
Machinery & Equipment
22,321.55
24,281.20
25,106.20
Business Trucks & Automobiles
2,622.91
5,255.48
5,255.48
Business Land & Buildings
26,350.00
26,350.00
26,350.00
Prepaid Business Insurance
272.42
778.91
492.61
Business Goodwill
375.00
375.00
375.00
Personal Property -
Lake Land & Furnishings
15,569.00
10,723.00
12,631.00
Home Furnishings & Jewelry
2,639.00
2,974.00
3,349.00
Automobiles
1,856.00
2,025.00
2,982.20
Total Assets
$76,629.64
$88,051.79
$95,190.75
LIABILITIES
Allowance for Depreciation -
Machinery & Equipment
$ 5,403.23
$ 6,449.25
$ 8,180.38
Truck & Automobile
943.59
566.82
1,791.84
Buildings
1,591.00
2,077.00
2,563.00
Total Liabilities
$ 7,937.82
$ 9,093.07
$12,535.22
$70,691.82
$78,958.72
$82,655.53
NET WORTH
Increase in Net Worth
$11,285.58
$ 8,266.90
$ 3,696.81
Estimate Cost of Living
3,500.00
3,500.00
3,600.00
TOTAL
14,785.58
11,766.90
7,296.81
Less: Inheritance
2,343.88
Total
$14,785.58
$ 9,423.02
$ 7,296.81
Plus: Federal Tax Paid
329.00
1,360.46
912.68
State Tax Paid
53.99
147.89
151.52
Personal Loss - Sale of Lake
850.00
Property
Corrected adjusted gross income
$15,168.57
$11,781.37
$ 8,361.01
on net worth basis
Adjusted gross income per return
$ 6,905.32
$ 6,980.27
$ 7,363.24
Increase in income
$ 8,263.25
$ 4,801.10
$ 997.77
*151 The parties have stipulated that "the assets, liabilities, receipts and payments shown as Exhibit 6-F, attached hereto, truly and correctly reflect assets, liabilities and transactions of petitioners as of the dates, or during the years, indicated thereon." They also stipulated certain supporting schedules to Exhibit 6-F. Exhibit 6-F is as follows: Line
Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1945
1946
1947
1948
ASSETS
1 Cash in banks - Exhibit A
$ 1,156.22
$ 3,386.31
$ 1,458.34
$ 971.28
2 Accounts Receivable
279.97
585.16
1,086.50
888.50
3 Land Contract
4 Supplies Inventory
888.75
1,170.50
1,231.30
1,433.65
5 Machinery & Equipment -
Exhibit B
8,550.00
13,229.67
18,814.47
19,808.86
6 Business Trucks & Automobiles -
Exhibit C
792.00
1,135.00
1,135.00
2,505.00
7 Business Land & Buildings -
Exhibit D
9,850.00
9,850.00
26,350.00
26,350.00
8 Prepaid Business Insurance
232.02
227.83
185.06
515.38
9 Lake Land & Furnishings -
Exhibit E
3,025.00
5,131.00
6,131.00
6,821.00
10 Home Furnishings & Jewelry -
Exhibit F
1,850.00
1,850.00
1,850.00
1,850.00
11 Automobiles - Exhibit G
902.00
1,237.00
1,237.00
1,500.00
12 Total - above assets
$27,525.96
$37,802.47
$59,478.67
$62,643.67
(Lines 1-11)
LIABILITIES - DEPRECIATION
13 Machinery & Equipment -
Exhibit H
$ 230.32
$ 1,001.32
$ 2,098.98
$ 3,450.28
14 Trucks & Automobiles - Exhibit
792.00
70.94
354.69
952.40
I
15 Buildings - Exhibit J
142.00
298.00
619.00
1,105.00
16 Total - above liabilities
$ 1,164.32
$ 1,370.26
$ 3,072.67
$ 5,507.68
(Lines 13-15)
17 Inheritance received
18 Federal Income Tax Paid -
Exhibit K
$ 632.00
$ 450.00
$ 604.00
19 Wisconsin Income Tax Paid
28.00
29.93
39.70
20 Loss on sale of lake property
21 Total - (Lines 18-20)
$ 660.00
$ 479.93
$ 643.70
*152 Line
Dec. 31,
Dec. 31,
Dec. 31,
1949
1950
1951
ASSETS
1 Cash in banks - Exhibit A
$ 4,135.28
$ 6,141.91
$ 9,104.16
2 Accounts Receivable
778.16
278.09
669.60
3 Land Contract
6,540.00
6,060.00
4 Supplies Inventory
1,440.32
2,059.20
2,545.50
5 Machinery & Equipment -
Exhibit B
20,292.32
22,073.82
22,823.82
6 Business Trucks & Automobiles -
Exhibit C
2,622.91
5,255.48
5,255.48
7 Business Land & Buildings -
Exhibit D
26,350.00
26,350.00h
26,350.00
8 Prepaid Business Insurance
272.42
778.91
492.61
9 Lake Land & Furnishings -
Exhibit E
15,569.00
10,723.00
12,631.00
10 Home Furnishings & Jewelry -
Exhibit F
2,639.00
2,974.00
3,349.00
11 Automobiles - Exhibit G
1,856.00
2,025.00
2,982.20
12 Total - above assets
75,955.41
$85,199.41
$92,263.37
(Lines 1-11)
LIABILITIES - DEPRECIATION
13 Machinery & Equipment -
Exhibit H
$ 4,904.34
$5,840.97
$ 7,411.71
14 Trucks & Automobiles - Exhibit
943.59
566.82
1,791.84
I
15 Buildings - Exhibit J
1,591.00
2,077.00
2,563.00
16 Total - above liabilities
$ 7,438.93
$ 8,484.79
$11,766.55
(Lines 13-15)
17 Inheritance received
2,343.88
18 Federal Income Tax Paid -
Exhibit K
329.00
1,360.46
912.00 * *153 19 Wisconsin Income Tax Paid
53.99
147.89
151.52
20 Loss on sale of lake property
850.00
21 Total - (Lines 18-20)
$ 382.99
$ 2,358.35
$ 1,063.52
Following Grosse's determination that the books and records were inadequate to determine taxable income they were returned to petitioners, who employed Joseph Barrett, an accountant, to assist them in rearranging such records in proper chronological order. After the books and records of Port Cleaners had been reorganized by Barrett they were sent to Chester R. Roberts, a certified public accountant, for review. In the course of such review the entries on the sales summary sheets were totaled and such totals compared with the amounts petitioners had entered in the cash journal as totals of the respective sheets. Roberts made no attempt to verify the accuracy of the amounts entered on such summary sheets. The following schedule reflects the amount of sales according to the summary sheets as determined in the accountant's review, the amount of sales as reported by petitioners and the net amount of the discrepancies between such reported and determined figures: 1946
1947
1948
Corrected sales
$22,987.92
$28,819.91
$42,737.37
Less: Summary not posted
488.97
Net errors in summaries
67.33
188.25
1,322.53
Sales reported
$22,920.59
$28,142.69
$41,414.84
*154 1949
1950
1951
Corrected sales
$45,633.03
$52,106.75
$61,945.06
Less: Summary not posted
990.97
Net errors in summaries
1,441.89
1,047.33
1,534.40
Sales reported
$43,200.17
$51,059.42
$60,410.66
In connection with the preparation of the above schedule accountant's work sheets were prepared. Such work sheets disclose the amount of overstatement or understatement of sales per week reflected by the entries in the cash disbursements journal as compared to the amount of sales found by the accountant after review of the summary sheets. The following schedule reflects the number, the type and amount of such errors as disclosed on the work sheets for the years 1949, 1950, and 1951 (work sheets for the years 1946 and 1947 were not placed in evidence): 1949
1950
1951
Number of weeks
51
52
52
Number of weeks summaries incorrect
36
36
23
Number of weeks error was understatement
29
29
17
Number of weeks error was overstatement
7
7
6
Total amount of understatement
$2,484.81
$1,130.83
$1,316.11
Total amount of overstatement
51.95
83.50
27.55
Average amount of understatement
85.68
38.99
77.42
Average amount of overstatement
7.92
11.93
4.59 The errors discovered by Roberts as the result of the aforementioned review were generally of two types, (1) *155 incorrect addition of the entries on the weekly summary sheets, or (2) errors in carrying such figures forward or in posting. Of the 75 instances of understatement during the threeyear period 1949 to 1951, inclusive, 41 of such understatements consisted of amounts that were even multiples of $10. Of the 20 instances of overstatement in this period, three consisted of amounts that were even multiples of $10. Opinion This is another so-called net worth case, the determination of which has caused us a considerable amount of difficulty and concern, due largely to the vagueness and inadequacy of the proof and the necessity finally of having to determine most, if not all of the questions involved on the failure of the parties to carry their respective burdens. In this connection it is appropriate at this stage to point out that petitioners have the burden of overcoming the presumptive correctness of the deficiencies determined by respondent, but that respondent has the burden with respect to the issues relating to fraud and limitations as presented by the affirmative allegations of his answer. It is a well established principle that "both parties may fail through inadequate proof on their *156 several issues, and thus the deficiency would be sustained and the penalty set aside." L. Schepp Co., 25 B.T.A. 419, 437; Drieborg v. Commissioner, 225 Fed. (2d) 216, affirming in part and reversing in part a Memorandum Opinion of this Court [13 TCM 170,]. First, with respect to the deficiencies determined by respondent by means of the net worth method, petitioners contend that their books, records and accounts are adequate for the purpose of computing their income and therefore that respondent was not justified in using the net worth method for the purpose of determining petitioners' net income in this case. In view of the numerous decisions which have discussed this subject, it would serve no useful purpose to dwell at length on this issue. It is noted that when presented to repondent's agents, petitioners' records had no semblance of order. This, of course, would not render them inadequate, though such lack of orderliness in keeping the records might suggest a lack of carefulness in making them. The magnitude of the task of arranging them would, of course, be no excuse for not examining all available records. Apparently, however, respondent's agents did arrange and examine all *157 the records that were presented to him. The books as such were essentially a single entry system which inherently is susceptible to errors that cannot readily be found. Respondent's agents found almost a complete absence of supporting data for the weekly sales and expense summaries, and also many inconsistencies between the summary sheets and the ledger. The accountants employed by petitioners to organize and review the records after they had been returned by respondent's agents also found certain discrepancies between the summary sheets and ledger due to failure to post and also mathematical errors in the summaries. It is noteworthy that they made no attempts to verify the amounts entered on the summaries. While these facts, of themselves, are not sufficient to establish understatement of income, or unreported sales, they are suggestive of such possibilities and invite other means to verify or ascertain petitioners' correct income. Under these circumstances, respondent was justified in resorting to the net worth method as a test of the accuracy of petitioners' income tax returns and as evidence of their correct net income. Morris Lipsitz, 21 T.C. 917, affd. 220 Fed. (2d) 871, certiorari *158 denied 350 U.S. 845; H. A. Hurley, 22 T.C. 1256, affd. 233 Fed. (2d) 177. Even where the books and records of a taxpayer appear on their face to be adequate, respondent is not precluded from using the net worth method. Davis v. Commissioner, 239 Fed. (2d) 187, affirming a Memorandum Opinion of this Court [14 TCM 294]. As suggested by the Supreme Court in Holland v. United States, 348 U.S. 121, rehearing denied 348 U.S. 932, books and records may be "more consistent than truthful." It is recognized that the net worth method is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income, regardless of the method of accounting followed by the taxpayer. By a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy, the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the books and on the returns. Michael Potson, 22 T.C. 912, affd. sub nom, Bodoglau v. Commissioner, 230 Fed. (2d) 336; Estate of George L. Cury, 23 T.C. 305 [Dec. 20,666]; Morris Lipsitz, supra; Harry Gleis, 24 T.C. 941, *159 affd. 245 Fed. (2d) 237. Petitioners' contention with respect to the propriety of respondent's use of the net worth method is accordingly rejected. Before proceeding to a consideration of respondent's net worth statement, it is to be noted that petitioners have conceded they failed to report certain amounts of sales during each of the years in issue, but argue that they incorrectly claimed allowable depreciation during such years and that the net results of such errors are the following amounts of conceded understatement or claimed overstatement of income: Year
Amount
1946
$ 385.79
1947
386.29 *
1949
906.88
1950
389.34
1951
1,743.65
We next consider whether respondent has erred in his determination of deficiencies in income tax of petitioners for the years in issue. Respondent's determination is based upon his net worth statement set forth in our findings. Comparison of this with Exhibit 6-F indicates the principal item in dispute between the parties to be the amount of cash on hand as of the beginning of the net worth period. Respondent determined that petitioners' opening cash amounted to $235. Petitioners contend that they had cash on hand on December 31, 1945, in *160 an amount no less than $42,000. To support their contention petitioners rely upon the familiar cash hoard story. In substance petitioners' story is that over the period of years prior to 1942 the members of the August Budahn family, with the exception of Leo, gave money to Anna Budahn to hold in safe keeping for them. According to petitioners, in 1942 Anna Budahn became ill and notified her children that she wished to turn the money over to them. According to their testimony, petitioners and Arthur Budahn subsequently visited Anna, at which time she gave them $52,000 and $12,000, respectively. The money purportedly given Anna constitutes the source of cash claimed to have been on hand at the beginning of the net worth period. Petitioners' cash hoard story is not only unsupported by the evidence, but is incredible. Petitioners admitted at the hearing that they could only guess how much of the $52,000 purportedly received from Anna represented money which they had given her to save. However, on brief they suggest that of such $52,000 received, approximately $18,135 represented their savings, apparently reasoning that the balance, amounting to $33,865, was contributed by Anna. Petitioners *161 admit that except to the extent of a $300 inheritance received by Anna, the sole source of the money purportedly received was the income and receipts of petitioners and Anna and August Budahn. We have carefully examined the entire record in an effort to determine whether petitioners' cash hoard story has any reliable basis. In our opinion the evidence demonstrates the improbability that such amount of cash could have been accumulated out of the combined earnings of petitioners and Lourene's parents prior to the year 1942. The evidence largely consists of vague and general statements by petitioners and Lourene's brother, Arthur, regarding the life of Lourene's parents, which show nothing more than that they were ordinary frugal working people. Statements in the record indicate that August Budahn worked as a laborer during most of his life and that Anna Budahn was a housewife who also rented rooms to tourists. There is no evidence that the Budahns ever filed a Federal income tax return, nor does it appear that they filed Wisconsin state income tax returns. The record is barren of any credible evidence respecting any specific amount of income of Lourene's parents except for Lourene's *162 statement that her parents sold the small farm in 1918 for $6,000; the copies of mortgages introduced into the record showing the interest earned thereon; and the evidence of interest earned on money placed in a savings account. Respondent's Exhibit KK, upon which petitioners rely as evidence of the amount of August Budahn's earnings as street commissioner, is insufficient to show what amount was earned prior to 1942, at the time of the purported gift, and accordingly it is of no value in determining the amount and sources of the purported cash hoard. At the time of her death in 1950 Anna had a personal estate consisting of $10,736.54, of which $10,261.97 consisted of money in savings accounts. Her personal residence was valued at $7,000, in which she also had a joint interest. In view of the evidence respecting the earnings of the Budahns, the fact that it was necessary to support a family of five from these earnings during many of the years, and the fact that Anna had over $10,000 at the time of her death, we find it unbelievable that in addition thereto she could have accumulated any sizeable amount prior to 1942. There is no evidence that Anna ever made any investments which resulted *163 in large gains. The possibility of any capital appreciation of original savings is therefore eliminated. The evidence presented with respect to petitioners' earnings convinces us that prior to 1942 their net savings were negligible. The evidence reveals only two years while they were purportedly depositing money with Anna, when the combined earnings of petitioners exceeded $2,000. The yearly average of their earnings amounted to less than $1,400. Furthermore, during most of this period the living expenses of three persons came from such earnings. In addition to the evidence of record which demonstrates the incredibility of the contention that the petitioners and Budahns accumulated the purported amount of cash, there are other factors which render their story unbelievable. First, according to petitioners' story, Anna added some $34,000 to petitioners' fund while she contributed only a few dollars to Arthur's. There is nothing in the record to suggest any reason for Anna's favoring Lourene in this manner. To the contrary, the record shows that Anna's will provided for the division of her estate into four equal shares and the distribution of only one of such shares to Lourene. Second, *164 according to petitioners' testimony when they returned home after allegedly receiving the cash from Anna they immediately counted it and the amount made a very definite impression upon them. Yet, when questioned by respondent's agents in connection with the amount of cash purportedly received they were unable to state definitely how much they received and repeatedly changed their answers. Third, the petitioners did not report any gifts received in response to questions with regard thereto on their Wisconsin state income tax return for 1942 although they purportedly received the money during that year. Nor does it appear that the Budahns reported any gift made. Assuming, arguendo, that in 1942 petitioners did receive some cash from Lourene's parents, in order to disturb respondent's determination it must appear that they received more than $10,000 since they appear to have consumed that much in the purchase of land, buildings and equipment, prior to the period in issue. Viewing the record in the light most favorable to petitioners, the evidence is not sufficient to establish that an amount exceeding $10,000 was accumulated prior to 1942. Accordingly, respondent's determination of cash *165 on hand is sustained. The next item in respondent's net worth statement as to which petitioners alleged error in their petition relates to the value placed upon machinery and equipment used in petitioners' dry cleaning business. Upon first reading of the stipulation and Exhibit 6-F referred to above, it might be concluded that the parties had settled their differences as to this item. However, both parties have briefed the question and it is assumed that the figures stipulated in Exhibit 6-F have reference to the amount paid by petitioners in the purchase of the equipment and do not include, or settle the question of, the cost of installation. The amounts shown in respondent's net worth statement exceed those shown in Exhibit 6-F by 10 per cent, which respondent argues is to be added to the stipulated amounts as cost of installing the machinery and equipment. Petitioners do not dispute the propriety in general of including installation expenses as a part of the over-all cost of machinery. They contend, however, that respondent's computation is erroneous because with only one exception no special installation costs were in fact incurred since the installation of the machinery here involved *166 was done by Kane with the assistance of Arthur Budahn and James Lynch. Respondent's agent stated that although the equipment possibly could have been installed by petitioners, since thousands of dollars of electrical and steam equipment was installed it appeared clear that some special installation expenses were incurred. He stated that in the net worth statement respondent had given petitioners credit for doing certain installation work themselves, and thereby had reduced estimated installation expenses from a normal 25 per cent of cost to 10 per cent. The only evidence offered to sustain petitioners' position was the self-serving, unconvincing testimony of Kane. Both Arthur Budahn and James Lynch, who purportedly assisted him with the installation of the machinery, appeared as witnesses for petitioners and presumably could have corroborated Kane's testimony. Yet neither witness was questioned with respect thereto. The petitioners' failure to offer such evidence creates the presumption that if offered it would not have been favorable to them. Wichita Terminal Elevator Co., 6 T.C. 1158, affd. 162 Fed. (2d) 513; Stoumen v. Commissioner, 208 Fed. (2d) 903, affirming a Memorandum *167 Opinion of this Court [12 TCM 267,]. In view of this and all other evidence respecting the equipment and its installation, we hold that petitioners have failed to sustain their burden of proving respondent's determination of such installation costs to be erroneous. In view of our conclusion respecting installation costs, we also conclude that the amounts allowed by respondent in his net worth statement for depreciation of machinery and equipment are appropriate. Petitioners have conceded, on brief, the correctness of the amounts included in respondent's net worth statement as living expenses. For the reasons set forth above and after careful examination of all the evidence, we conclude that petitioners have failed to overcome the presumptive correctness of the deficiencies determined by respondent for each of the years in issue. We turn next to those issues as to which respondent has the burden of proof, to wit: fraud, the omission in excess of 25 per cent of gross income, and limitations. Respondent contends that a part of the deficiency determined for each of the years in issue was due to fraud with intent to evade tax, thus subjecting petitioners to liability for additions to tax *168 under section 293(b) of the Internal Revenue Code of 1939. He also contends that the returns filed for the years 1946 and 1947 were false or fraudulent with intent to evade tax within the meaning of section 276(a) and accordingly that the assessment and collection of the deficiencies and additions to tax determined for those years are not barred by limitations. The burden of proof with respect to fraud is upon the respondent. Section 1112, I.R.C. 1939. A charge of fraud is never to be presumed, but must be established by respondent by clear and convincing evidence. Henry S. Kerbaugh, 29 B.T.A. 1014, affd. 74 Fed. (2d) 749; Arlette Coat Co., 14 T.C. 751; W. A. Shaw, 27 T.C. 561, affd. 252 Fed. (2d) 681. As pointed out earlier in this opinion, it it well established that "both parties may fail through inadequate proof on their several issues." We believe that respondent has failed to meet his burden of proof of fraud for any of the years involved herein. We reach this conclusion notwithstanding we have heretofore sustained respondent's determination of deficiencies for each of the years involved. As appears from our discussion with respect to that issue, our conclusion is based *169 upon the failure of petitioners to meet their burden. It has long been held that the fact that the respondent determined a greater tax liability than reported and his determination is sustained does not of itself establish fraud. Estate of Louis L. Briden, 11 T.C. 1095, 1132, affd. sub nom Kirk v. Commissioner, 179 Fed. (2d) 619; Harold B. Franklin, 34 B.T.A. 927, 935; James Nicholson, 32 B.T.A. 977, affd. 90 Fed. (2d) 978. In the more recent case of Drieborg v. Commissioner, supra, the Sixth Circuit Court of Appeals said: "At the outset it should be emphasized that the failure of the taxpayers to overcome the presumptive correctness of the deficiencies, even though those deficiencies cover a consecutive ten year period, cannot be regarded, in and of itself, as sufficient proof that the deficiencies or any part thereof were due to fraud on the part of the taxpayers. To hold otherwise would be to ignore the statute which imposes on the Commissioner the burden of proving fraud, and the often repeated admonition that such proof must be by clear and convincing evidence. Wiseley v. Commissioner, 6 Cir., 1950, 185 Fed. (2d) 263; Rogers v. Commissioner, 6 Cir., 1940, 111 Fed. (2d) 987, 989; *170 Mitchell v. Commissioner, 5 Cir., 1941, 118 Fed. (2d) 308. There must be additional independent evidence from which fraudulent intent on the part of the taxpayer can be properly inferred. * * * "The the difference in the burden of proving ordinary tax deficiencies and civil fraud can have important practical results has long been recognized. 'As to the issue raised by [the Commissioner's] determination of fraud the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside.' L. Schepp Co., 1932, 25 B.T.A. 419, 437." * * * Considered in the context of those cases, it is to be noted that had we accepted the testimony that Lourene's mother turned $52,000 over to petitioners in 1942 and that petitioners had cash on hand in the amount of at least $42,000 at the beginning of the net worth period, there would have been no understatement of income for any of the years involved. Our failure to find these facts on issues as to which petitioners have the burden is not equivalent *171 to affirmative findings on the fraud issues, as to which respondent has the burden, that petitioners did not have * such an amount of money on hand as of December 31, 1945. Respondent has not established the omission of any specific items of income in the returns for the years involved, but bases his contention of fraud on the understatements shown by his net worth statement, the inadequacy of the records, and certain errors shown in petitioners' account due to failure to post and mathematical errors. The errors shown in the books and records were of more or less minor importance and indicate carelessness, inefficiency and negligence but are hardly sufficient to establish willful intent to defraud. An essential element to the establishment of fraud, under section 293(b) and section 276(a), is that of "intent to evade tax," described in E. S. Iley, 19 T.C. 631, 635, as "the intent to defraud the government by calculated tax evasions," and in Mitchell v. Commissioner, 118 Fed. (2d) 308, 310, reversing 40 B.T.A. 424, as "the specific *172 purpose to evade a tax believed to be owing." "Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute." Mitchell v. Commissioner, supra. The question of intention is a factual one to be resolved from a consideration of the entire record. M. Rea Gano, 19 B.T.A. 518; E. S. Iley, supra.It is recognized that the consistent and substantial understatement of income over a period of years may constitute clear and convincing evidence of fraud. Holland v. United States, 348 U.S. 121. However, where the understatement of income is established only by reason of petitioners' failure to sustain their burden of overcoming the presumptive correctness of respondent's determination based upon the net worth method there must be some additional independent evidence from which fraudulent intent can properly be inferred. Drieborg v. Commissioner, supra. Considering the record as a whole we conclude that respondent has not established by clear and convincing evidence that any part of the deficiencies for any of the years involved was due to fraud with intent to evade tax. Accordingly, petitioners are not liable for any addition to tax *173 under the provisions of section 293(b) for any of the years in issue. It necessarily follows from what we have said above that respondent has likewise failed to establish that the returns filed by petitioners for the years 1946 and 1947 were false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the Internal Revenue Code of 1939. Accordingly, petitioners' claim that the assessment and collection of the deficiencies and additions to tax for the years 1946 and 1947 are barred by limitations must be sustained, unless, as affirmatively alleged by respondent in his answer, it is established by respondent that petitioners omitted from gross income an amount properly includible therein in excess of 25 per cent of the gross income stated in the returns for those years, within the meaning of section 275(c) of the I.R.C. of 1939. In this connection it is noted that respondent alleged the execution of a series of waivers or consents agreeing to the extension of the period of limitations on assessment of deficiencies and additions to tax, as to each of said years, provided the provisions of section 275(c) are applicable, each series beginning within five years from *174 the effective date the respective return was filed. Petitioners, in their reply, denied, on information and belief, the execution of certain of the waivers or consents, which, if true, would have broken the chain and have rendered section 275(c) inapplicable. None of the alleged waivers were placed in evidence. At the trial, however, the parties stipulated that the assessment of additional income taxes and "penalties," for each of the years 1946 and 1947, is barred by section 275, except as it should appear that petitioners omitted from gross income an amount properly includible therein in excess of 25 per cent of the amount of gross income stated in the return, within the meaning of section 275(c), or the return for such year was filed falsely or fraudulently with intent to evade tax, within the meaning of section 276(a). We assume from this that respondent satisfied petitioners that such waivers had been executed and that petitioners no longer urge the non-execution of timely waivers. Section 276(c), providing for a five-year period of limitations, is an exception to section 275(a) providing for a three-year period of limitations. As such the burden is upon the respondent, who is *175 relying upon such exception to establish its application. C. A. Reis, 1 T.C. 9, affd. 142 Fed. (2d) 900. As in the case of the exception on account of fraud provided by section 276(a), respondent's burden of proof is not met by the presumption of correctness attaching to his deficiency notice nor by the mere fact that we have sustained respondent's determination with respect to such deficiencies arrived at by use of the net worth method, due to petitioners' failure to overcome the presumptive correctness of respondent's determination. Cf. C. A. Reis, supra; Estate of Louis L. Briden, supra. In the recent case of Colony, Inc. v. Commissioner, 357 U.S. 28 (1958), the Supreme Court stated that section 275(c) "is limited to situations in which specific receipts or accruals of income items are left out of the computation of gross income." (Emphasis by the Court.) It further stated that the statute was not intended to apply "more generally to errors in that computation arising from other causes." As pointed out in our discussion of the fraud issue, respondent has not established the omission of any specific items of income in the returns for the years involved. On the record respondent *176 has not established that petitioners omitted from gross income an amount properly includible therein in excess of 25 per cent of the gross income stated in the return for either 1946 or 1947. Accordingly he has failed to sustain his burden under section 275(c). Having held that respondent has failed to establish fraud for either of said years, we must conclude that the assessment and collection of the deficiencies and additions to tax for the years 1946 and 1947 are barred by the statute of limitations. We come finally to the question whether petitioners are liable for the additions to tax determined by respondent, under section 294(d)(2) of the Internal Revenue Code of 1939 for "substantial underestimate of estimated tax" for each of the years 1946, 1947, 1949, and 1950. Our holding above that the assessment and collection of the deficiencies and additions to tax for the years 1946 and 1947 are barred by the statute of limitations applies to the additions to tax under section 294(d)(2) here involved. Although petitioners assigned error in their petition to respondent's determination of additions to tax under section 294(d)(2) they offered no evidence with respect thereto and did not *177 mention it on brief. Accordingly, we must assume they have abandoned this issue, and respondent's determination of additions to tax under section 294(d)(2) for the years 1949 and 1950 is sustained. See Albert N. Shahadi, et al. v. Commissioner, 366 F.2d 495 (C.A. 3, April 16, 1959), affirming 29 T.C. 1157. Decision will be entered under Rule 50. Footnotes
*. The discrepancy (68() between this and the similar item in respondent's net worth statement is unexplained.
*. claimed overstatement↩
*. The word "had" was deleted and the words "did not have" were added by an official order of the Tax Court, dated June 23, 1959 and signed by Judge Bruce.↩